

# In the Missouri Court of Appeals
## Eastern District

### DIVISION FOUR

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED103039 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court |
| | ) | of St. Charles County |
| vs. | ) | |
| | ) | Honorable Ted House |
| VICTORIA SMITH, | ) | |
| | ) | |
| Appellant. | ) | FILED: August 30, 2016 |

### Introduction

Appellant Victoria Smith ("Smith") appeals from the judgment of the trial court following a jury trial in which she was convicted of first-degree endangering the welfare of her child ("Victim"). Smith contends there was insufficient evidence to support her conviction. She also argues that the trial court erred in allowing expert testimony regarding the significant risk to Victim's physical, psychological, and emotional health, and testimony from emergency personnel who responded to Smith's home. The totality of the evidence supported a finding that Smith knowingly acted in a manner that created a substantial risk to Victim; thus, the evidence was sufficient to support her conviction. Because the trial court did not err in admitting the expert testimony or the testimony of emergency personnel who arrived at the scene, the trial court's judgment is affirmed.

<u>Factual and Procedural History</u>

The following facts, when viewed in the light most favorable to the verdict, were adduced at trial:

Smith lived with her husband and their six children, including their six-year-old son ("Victim"). Victim suffered from a form of autism. Deondus Towers ("Towers"), a certified nurse assistant, cared for Victim after school on weekdays and all day on weekends.

Towers usually cared for Victim away from Victim's home. For example, Towers and Victim would go to the mall, attend the football games of Towers's son, and go to the park. When Towers picked Victim up from home, he would smell badly, and Towers would bathe him. Throughout Towers's time with Victim, Victim was well behaved. Victim acted like a "typical kid" at Towers's home: he used the bathroom, slept in Towers's son's bed, and ate at restaurants without incident.

One weekend, Towers was unable to care for Victim. When Towers resumed her care, Smith told Towers that Victim had been kept in the enclosed bed all weekend. This information concerned Towers, who realized that Victim would resist going to sleep in the basement "95 percent of the time" when she would return Victim to his home. Towers asked to see Victim's sleeping arrangements. Smith allowed Towers into the basement, and Towers immediately noticed a smell. Towers characterized the smell as worse than monkeys at the zoo. Towers noticed that the top of Victim's bed was enclosed to prevent escape and that there was no access to the bed in case of an emergency. Towers called the child-abuse hotline after seeing Victim's sleeping arrangements.

Child Abuse Investigator Kenneth Spellmeyer ("Investigator Spellmeyer") and Officer Richard DeWitt ("Officer DeWitt") responded to the hotline call and went to Smith's home. Smith's mother, Merilyn Jones ("Jones") answered the door and explained that she was caring

2

for the children while Smith and her husband were grocery shopping. Jones, a 69-year-old diabetic, could not climb the stairs because of mobility issues due to a recent stroke. Jones admitted that it was difficult to care for the children. When asked about Victim, Jones explained that he was kept in the enclosed bed because he was autistic. Jones allowed Investigator Spellmeyer and Officer DeWitt into the basement; the smell of urine was apparent to them upon entering the home, and became noticeably stronger as they descended into the basement.

In the basement, Victim was laying naked in his bed, as he had removed his diaper. A metal structure enclosed the top of the bed, which measured three feet high, three feet wide, and six feet long. Zip-ties, rope, and plywood secured the metal bars. Feces and urine covered the bed. Investigator Spellmeyer characterized the bed as "exceptionally unsafe." Jones did not see a problem with the bed, but she admitted not knowing how to remove Victim from the bed in the event of an emergency. Two of Victim's siblings stated that Victim rarely left the enclosed bed. The family fed Victim hot dogs or chicken nuggets through the metal bars.

Officers attempted to remove Victim from the enclosed bed, but were unable to do so without cutting through the zip-ties securing the metal bars. Urine streamed from the bedding as the officers deconstructed the enclosure on the bed. Paramedics cleaned Victim with towels and transported him to the hospital.

Fire Marshal Mark Morrison testified at trial that the basement was inappropriate for a bedroom because the basement's windows did not permit egress if a fire occurred. Recognizing that Victim could not get out of the enclosed bed, Morrison opined that the enclosed bed would have hampered a rescue attempt in the event of a fire.

The State also called Dr. John Constantino ("Dr. Constantino"), a professor of psychiatry and pediatrics, as an expert witness. Dr. Constantino testified regarding the relationship between

3

environmental factors and the severity of autism, emphasizing that the ability of autistic children to adapt is "profoundly influenced" by their environment. In addition to exposure to infectious diseases, Dr. Constantino opined that Victim's environment likely exacerbated his condition and—to a reasonable degree of medical certainty—posed a significant risk to his physical, psychological, and emotional health and well-being. Defense counsel objected to this testimony, arguing that Dr. Constantino was "invading the province of the jury." The trial court overruled the objection.

Dr. David Easterday ("Dr. Easterday") testified for the defense. Dr. Easterday had diagnosed Victim with autism and continued as his primary care physician. Dr. Easterday recognized that the enclosed bed presented a safety concern had Victim suffered a medical emergency. Had he seen Victim's living arrangements in the enclosed bed, Dr. Easterday admitted that he would have called the child abuse hotline. Dr. Easterday opined that sitting in an enclosed bed for three hours without a caregiver able to remove Victim would have endangered Victim.

A jury convicted Smith of first-degree endangering the welfare of a child. After the jury's guilty verdict, the case proceeded to the penalty phase for jury sentencing.

The State called Investigator Spellmeyer, the Children's Division investigator, as a witness. Defense counsel objected that Investigator Spellmeyer's testimony was improper because he was not a victim, was not related to the victim, and was not able to testify about Smith's character or personal history. The trial court, over frequent objections, allowed Investigator Spellmeyer to testify. Investigator Spellmeyer testified that he had never "encountered a family that seemed to disregard care of the general responsibility for their

4

actions." Investigator Spellmeyer compared this situation to his own brother-in-law, who was also autistic, and stated that he thought of this case every time he walked past a dog cage.

Several additional emergency personnel testified over objection about how this case had affected their lives. Police Officer David Buehrle ("Officer Buehrle") testified, "[This case] played a part of my decision to retire a year later. This gets old, it gets tiring, and I didn't want to see it anymore." Police Officer Jeff Lange ("Officer Lange") recounted how this case made him break down and how he would never forget the first sight of Victim. Paramedic Greg Pendleton ("Pendleton") testified that he would never forget Victim: "So any time I see a child with any disability, not just autism, I see [Victim]. And I—it's been a long time. And my one greatest wish was to find some closure. And today that has been granted to me." Paramedic Lisa Cassidy ("Cassidy") expressed similar feelings, "[there are] some things you can't unsee ... in sixteen years, I've never seen anything like that. It was inhumane to me. And I've seen a lot of things."

The jury recommended the maximum sentence of seven years' imprisonment and a fine to be determined by the trial court. The trial court accepted the recommendation of seven years and imposed a $500 fine. This appeal follows.

<u>Points on Appeal</u>

Smith raises three points on appeal. First, Smith argues that the trial court erred in overruling defense counsel's motion for judgment of acquittal because the evidence was insufficient to convict her for endangering the welfare of a child. Specifically, Smith asserts that the State failed to prove that she knowingly created a substantial risk to the life, body, and health of Victim. Second, Smith argues that the trial court plainly erred in overruling her objection to Dr. Constantino's testimony regarding the significant risk Victim's environment posed to his physical, psychological, and emotional health. Specifically, Smith asserts that the testimony

5

improperly invaded the province of the jury on an ultimate issue of whether the crime had occurred. Third, Smith argues that the trial court abused its discretion in allowing Investigator Spellmeyer, Officer Buehrle, Officer Lange, Pendleton, and Cassidy to testify about their experiences during the penalty phase of the trial. Specifically, Smith asserts that those witnesses were precluded from testifying because they were not victims or members of the victim's family.

## Discussion

### I. Point One—Sufficiency of the Evidence

Smith argues that the State's evidence was insufficient to convict her of knowingly acting in a manner that created a substantial risk to the life, body, or health of Victim. We disagree.

#### A. Standard of Review

To determine whether the State presented sufficient evidence to sustain a conviction, we consider each of the elements of the crime. State v. Grim, 854 S.W.2d 403, 411 (Mo. banc 1993). We view the evidence in the light most favorable to the State and grant the State all reasonable inferences from the evidence. Id. This Court disregards any evidence and inferences that are contrary to the verdict. State v. Miller, 372 S.W.3d 455, 463 (Mo. banc 2012). On appeal, we do not act as a "super juror" with veto powers; the jury's decision is entitled to great deference. Id. Thus, our inquiry is not whether we believe the defendant's guilt, but whether any rational juror could have found the crime's essential elements beyond a reasonable doubt. Id.

#### B. Sufficient Evidence Existed

A person is guilty of first-degree endangering the welfare of a child if that person "knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child

6

less than seventeen years old." Section 568.045.1(1) (Cum. Supp. 2010).[1] The State must prove the following elements: "(1) the defendant engaged in conduct, (2) in so doing, the defendant created a substantial risk to the life, body, or health of a child, (3) the victim was less than seventeen years old, and (4) the defendant acted knowingly with respect to the facts and circumstances." State v. Short, 186 S.W.3d 828, 830–31 (Mo. App. E.D. 2006). The first and third elements are undisputed by the parties, as sufficient evidence allowed the jury to find that Smith engaged in conduct requiring Victim to stay in the enclosed bed, and that Victim was less than seventeen years old. We address the remaining elements in turn. See Grim, 854 S.W.2d at 411.

### 1. Substantial Risk to Victim's Life, Body, or Health

First, we consider whether the State presented sufficient evidence that keeping Victim in the enclosed bed in the condition in which Victim was found created a substantial risk to his life, body, or health. Health, as used in Section 568.045.1(1), encompasses physical, mental, emotional, and psychological health. See State v. Loughridge, 395 S.W.3d 605, 609 (Mo. App. S.D. 2013). The statute does not require the victim to sustain an injury; instead, the defendant's conduct must create only a substantial risk of harm to be actionable. State v. Hopson, 168 S.W.3d 557, 563 (Mo. App. E.D. 2005). "In the context of the child endangerment statute, *substantial* means 'not seeming or imaginary'[,] and *risk* means 'the possibility of loss, injury, disadvantage or destruction." State v. Randle, 456 S.W.3d 535, 542–43 (Mo. App. E.D. 2015) (quoting State v. Fowler, 435 S.W.3d 90, 94 (Mo. App. S.D. 2014)). We determine whether a defendant created a substantial risk to the victim by considering the totality of the circumstances from the evidence presented. Randle, 456 S.W.3d at 543.

---

[1] All statutory references are to RSMo (2000), unless otherwise noted.

Considering the totality of the circumstances, sufficient evidence is present in the record before us to allow a reasonable juror to find that the Victim's living conditions at his home posed a substantial risk to Victim's life, body, or health. With regard to Victim's life, the State presented evidence that Victim was kept in an enclosed bed held together by metal bars, wood, and zip-ties. Victim had no means of egress from the bed in case of an emergency. Officers testified they were unable to free Victim from the enclosure without cutting through the zip-ties securing the metal bars. Investigator Spellmeyer characterized the bed as "exceptionally unsafe." The fire marshal testified that the basement was inadequate for a bedroom because the basement windows did not allow egress if a fire occurred. The fire marshal also opined that the bed's enclosure would hamper any rescue attempt in the case of a fire because of the difficulty in removing Victim from the bed. Victim's caretaker, Jones, could not descend the stairs to the basement in the case of emergency or otherwise because she had limited mobility. Even if Jones could have gained access to the basement, she did not know how to open the enclosure on the bed. Given the lack of a functional caretaker and Victim's inability to exit—or be removed from—the bed in the case of an emergency, a reasonable jury might conclude that the situation posed a substantial and real risk to Victim's life.

The State also presented sufficient evidence of a substantial risk to Victim's physical health. Officers testified that they smelled urine upon entering the home, and the smell strengthened as they entered the basement. Those officers encountered Victim, in the enclosed bed, lying naked in his own urine and feces. Officers testified that the bed was so saturated that the urine flowed out of the bedding upon removal. Dr. Constantino testified that Victim's urine and feces contaminated bed exposed Victim to infectious diseases. Even Dr. Easterday, Victim's primary care physician who testified as a defense witness, acknowledged that he would have

8

called the child abuse hotline had he known that Victim's bed was saturated in urine and contained feces. Given this evidence, the jury reasonably could conclude that the risk to Victim's physical health as a result of his living environment was real and substantial.

Finally, the State presented evidence that Victim's situation posed a substantial risk to his psychological health. Dr. Constantino testified that the ability of autistic children to adapt is "profoundly influenced" by their environment and stressed that keeping Victim in such an enclosure as he was found likely exacerbated Victim's autism. Smith explained that she kept Victim in the enclosed bed only as a necessity and precaution because Victim was highly autistic and might injure himself if not contained. The State presented evidence from Towers, his regular caregiver, who testified that Victim behaved much better when away from his home. Despite having autism, Towers described how Victim acted like a "typical kid" outside the home, using the bathroom, sleeping in Towers's son's unenclosed bed, and eating at restaurants without incident. Given the contrast in Victim's conduct and behavior when at home and away from home, we are persuaded that a reasonable jury could find that subjecting Victim to a living environment that included an enclosed, urine and feces contaminated bed presented a substantial risk to Victim's psychological health.

Because the jury might reasonably find a substantial risk to Victim in any of these ways, the State presented sufficient evidence of this element.

### 2. Sufficient Evidence that Smith Acted Knowingly

Having found that sufficient evidence of a substantial risk exists, we now turn to the heart of Smith's argument on this point of appeal: did the State present sufficient evidence proving that Smith knowingly acted in a manner that created this risk of harm to her son.

To determine whether a person knowingly acted in a manner that created a substantial risk, there is no bright-line test; instead, we consider the totality of the circumstances. State v.

9

Rinehart, 383 S.W.3d 95, 103 (Mo. App. W.D. 2012). Section 562.016.3 defines the knowledge requirement:

> A person "acts knowingly", or with knowledge, (1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or (2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result.

The State may prove a defendant's knowledge by direct or circumstantial evidence. Rinehart, 383 S.W.3d at 103. However, direct proof of a defendant's mental state is seldom available, so such intent is usually inferred from the circumstances. Id. In addition to reasonable inferences drawn from surrounding facts, a fact-finder may reasonably infer a defendant's mental state from the act itself. Id.

Smith's conduct and Victim's appearance when found by the emergency personnel reasonably support an inference that Smith's conduct in creating that risk was knowing. First, Smith left Victim in the care of Jones, who admittedly could not remove Victim from the bed in the event of emergency. Officers found Victim in a filthy, unsanitary enclosed bed. Urine saturated Victim's bed, which also contained amounts of feces. Further, according to Towers, the basement smelled "worse than the monkeys ... at the zoo." The severity and extent of the unsanitary conditions supports a reasonable inference that Victim's foul living environment was chronic, and not a recent development of which Smith was unaware. Smith's conduct of subjecting Victim to such unsanitary living conditions supports a reasonable inference that Smith knowingly acted in a manner that created a substantial risk to Victim. Further, a fact-finder may also draw inference about a defendant's knowledge based upon a child's appearance. Rinehart, 383 S.W.3d at 103; see also State v. Buhr, 169 S.W.3d 170, 177 (Mo. App. W.D. 2005) ("The visible appearance of a child can give notice to the parents that their child is being abused or

10

needs medical attention."). Victim's appearance in an enclosed bed having such obviously visible unsanitary living conditions supports a reasonable inference that Smith acted knowingly.

Finally, a defendant's prior similar acts, in the totality of the circumstances, "could lead a jury to determine that [the defendant] acted knowingly in repeating the same action at a later time." Rinehart, 383 S.W.3d at 103 (quoting State v. Manwarren, 139 S.W.3d 267, 272 (Mo. App. S.D. 2004)). Here, the evidence suggests that finding Victim in the urine-soaked enclosed bed containing amounts of feces was not an isolated occurrence, but portrayed Victim's chronic living environment at his home. Victim frequently smelled badly when Towers would pick up Victim from Smith's home. Towers would bathe Victim, bring Victim home clean, and the process would repeat itself. Smith admitted to Towers that Victim had been kept in his enclosed bed all weekend on at least one occasion. Additionally, two of Victim's siblings stated that Victim rarely left the enclosed bed; instead, the family fed Victim hotdogs and chicken nuggets through the metal bars. Along with the nature of the conduct and Victim's physical appearance, Smith's prior similar acts of keeping Victim in these unsanitary and unsafe living conditions supported a reasonable inference that Smith acted knowingly on the night officers encountered Victim.

When viewing the totality of the circumstances in the light most favorable to the State, the jury could reasonably infer that Smith was aware of the nature of her conduct that created the substantial risk of harm to Victim. See Section 562.016.3. Thus, the jury could reasonably infer that Smith knowingly acted in a manner that created the substantial risk to Victim.

Smith defends against the charges by emphasizing her limited financial ability to provide for a better enclosed sleeping environment for Victim. Smith maintains that the State has "lost sight that this was a family of extremely limited income trying to do the best they could to care

11

for and ensure the well-being and safety of their severely handicapped autistic child." We recognize the challenges of caring for a severely autistic child, with or without limited financial means, and are sympathetic to the plight of Smith and her family. But the challenges and obstacles presented to Smith by her individual circumstances cannot justify or somehow rationalize her conduct of restricting her child to a feces and urine contaminated enclosed bed for potentially days and days on end. We remind Smith that the evidence presented to the jury was not limited to Victim sleeping in an enclosed bed in a basement without egress for emergency situations. No, the evidence encompassed and portrayed obviously vile living conditions which Smith knew created a much greater risk of very real harm to Victim.

Were the facts presented to the jury limited to Victim sleeping in a sanitary yet enclosed bed, the jury verdict may very well have been different. But the record of Smith's knowledge of the substantial risk presented to Victim is not limited to the sleeping arrangements provided by Smith for Victim. The continuous presence of urine and feces in the bed is not reasonably disregarded. The discernable difference in Victim's behavior, hygiene, and appearance when away from his home and with his caregiver is not reasonably ignored. The evidence that the bed enclosed with metal bars, plywood, and zip-ties was not used merely for sleeping, but was Victim's continuous and usual living environment at home with Smith is not reasonably overlooked. The jury heard evidence that Victim was rarely let out of the enclosed bed when at home and was fed through the bars. The jury heard evidence that Victim routinely resisted going into the basement when returned to his home by his caregiver. This evidence, when combined with evidence of the filth and sordid conditions of the bedding when authorities responded to the hotline call, belies Smith's argument that Victim's environment was merely the tragic, sad, and

12

unavoidable result of a financially strapped parent doing the best she could under extreme circumstances.

We fully understand the scenario Smith presented to the jury through her evidence. We also recognize the scenario presented to the jury by the State, which countered Smith's explanation of Victim's living conditions. In the end, it was for the jury to decide if the evidence presented to them supported a finding that Smith knowingly acted in a manner that created a substantial risk of harm to her son. Our task is not to second-guess the jury. Grim, 854 S.W.2d at 411. Our standard of review limits us to viewing the evidence and reasonable inferences in the light most favorable to the State. Id. When viewed through this lens, the evidence reveals an autistic child sitting naked in a urine-soaked, enclosed bed containing feces with no means of escape. One expert opined that Victim was at risk in the event of a fire or other emergency because of the enclosed bed and the lack of a means of egress from the basement. Another expert opined that Victim's environment likely exacerbated his autism; and this opinion was consistent with the caregiver's testimony that Victim acted like a "typical kid" when outside the home. Smith's conduct of leaving Victim in those conditions without an able caregiver, Victim's physical appearance, and Smith's prior similar conduct reasonably suggests that Smith knowingly acted in a manner that created this risk to Victim. Accordingly, the totality of the State's evidence sufficiently supported Smith's conviction for first-degree endangering the welfare of Victim. Point One is denied.

## II.     Point Two—Expert Testimony

Smith next argues that the trial court plainly erred in allowing Dr. Constantino to testify that keeping Victim in the enclosed bed was a significant risk to his physical, psychological, and emotional health and well-being. Smith posits that Dr. Constantino's testimony invaded the

13

province of the jury on an ultimate issue, and therefore, should have been excluded. We disagree.

A.    Standard of Review

Smith concedes that she did not preserve this issue because it was not raised in her motion for new trial. We have the discretion to review unpreserved issues for plain error. State v. Baumruk, 280 S.W.3d 600, 607 (Mo. banc 2009); Rule 30.20. Plain errors are "evident, obvious and clear." State v. White, 247 S.W.3d 557, 561 (Mo. App. E.D. 2007). A request for plain-error review triggers a two-step analysis. Id. First, we review the claim on its face: whether the claim of error facially establishes substantial grounds for believing that a manifest injustice or miscarriage of justice occurred. Id. If facial grounds do not exist, we reject the appellant's claim. Id. However, if facial grounds exist, the second step of our analysis is to determine whether the manifest injustice or miscarriage of justice *actually* occurred. Id.

B.    Expert Testimony was Properly Admitted

Generally, the trial court has the discretion to admit or exclude an expert's testimony. State v. Bowman, 337 S.W.3d 679, 690 (Mo. banc 2011). "Expert testimony is admissible when the subject of the testimony is one on which the jurors otherwise would be incapable of drawing a proper conclusion from the facts in evidence." Id. The general purpose of expert testimony is to aid the jury in areas of a trial outside the everyday experience of a typical juror. State v. Cochran, 365 S.W.3d 628, 633 (Mo. App. W.D. 2012). "Experts may testify to ultimate issues in a case so long as it aids the jury and does not invade its province." Id. "An expert may not substitute his reasoning and conclusions for the reasoning and conclusions of the jury upon the issue, or issues, before the triers of fact." Id. at 634. Missouri courts have identified a number of instances where expert testimony invades the province of the jury. Id. For example, experts cannot testify about the veracity of other witnesses, whether the defendant is actually guilty or

14

innocent, or whether the defendant actually deliberated. Id. The defendant's state of mind is clearly within the province of the jury. Id.

Proceeding to the first step of our plain-error review, we must determine whether Smith's claim facially establishes grounds for believing that a manifest injustice or miscarriage of justice occurred. First, the trial court reasonably decided that Dr. Constantino's testimony aided the jury. Dr. Constantino testified about autism in general, the effect of a child's environment on the child's autism, and his opinion on the level of risk to Victim's autism associated with keeping Victim in such an enclosed bed. The trial court could reasonably conclude that the effect of an environment on autistic children is outside the everyday experience of a typical juror and that Dr. Constantino's opinion about the risks of Victim's environment on his autism aided the jury's decision. Thus, the trial court could reasonably decide that Dr. Constantino's testimony would aid the jury in its consideration of the requirement of the risk of harm to victim. See Cochran, 365 S.W.3d at 633.

Further, we cannot conclude that Dr. Constantino's testimony invaded the province of the jury. Dr. Constantino's testimony did not comment on the veracity of other witnesses. Dr. Constantino did not opine about Smith's guilt, innocence, or mental state. Dr. Constantino merely testified that Victim's environment likely adversely affected his autism and that this effect posed a "significant risk" to Victim's physical, psychological, and emotional health. This opinion commented on the nature of the risk to Victim, but it did not comment on Smith's responsibility. Cf. State v. Harris, 305 S.W.3d 482, 491 (Mo. App. E.D. 2010) (the expert "merely commented on the ultimate issue of the cause and nature of the victim's injuries; she did not comment on Defendant's responsibility for those injuries"). Also, Dr. Constantino did not substitute his reasoning and conclusions for the jury's; the jury was still required to determine

15

whether the risk was a "substantial risk" to the life, body, or health of Victim under Section 568.045.1(1) and whether Smith knowingly acted in a manner that created the risk.

Smith has not facially demonstrated any trial-court error, much less error that was evident, obvious, and clear. White, 247 S.W.3d at 561. Because we find no grounds to believe that any error occurred, plain or otherwise, we reject Smith's claim. Id. Point Two is denied.

## III.     Point Three—Penalty-Phase Testimony

Lastly, Smith argues that Sections 557.036.3 (Cum. Supp. 2010) and 557.041.2 prohibited Investigator Spellmeyer, Officer Buehrle, Officer Lange, Pendleton, and Cassidy from testifying during the penalty phase of trial. Smith's argument and reliance on these statutory provisions is without merit.

### A.     Standard of Review

During the penalty phase, the trial court has the discretion to admit whatever evidence it deems helpful in assessing punishment. Gill v. State, 300 S.W.3d 225, 232 (Mo. banc 2009); State v. Clark, 197 S.W.3d 598, 599 (Mo. banc 2006). We reverse only if we find an abuse of that discretion. Clark, 197 S.W.3d at 599. A trial court abuses its discretion when a "ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." Id.

### B.     No Abuse of Discretion

In the penalty phase of a jury trial, "[s]uch evidence may include, within the discretion of the court, evidence concerning the impact of the crime upon the victim, the victim's family and others, the nature and circumstances of the offense, and the history and character of the defendant." Section 557.036.3 (emphasis added).

Smith argues that impact testimony permitted under Section 557.036.3 is limited to victims and their family members; thus, the trial court erred in allowing the emergency personnel

16

to testify about the impact of Smith's crime on them individually. Smith's argument finds no support in the text of Section 557.036.3, which specifically allows "evidence concerning the impact of the crime upon the victim, the victim's family **and others**." (Emphasis added.) The emergency personnel qualify as "others" under the plain language of the statute; thus, Section 557.036.3 does not limit the trial court's broad discretion to admit the testimony of the emergency personnel here. See Gill, 300 S.W.3d at 232.

Smith next argues that Section 557.041.2 prohibited the emergency personnel from testifying during the penalty phase because they were not victims. We again disagree. Section 557.041.2 provides: "the victim of [a felony] offense may appear before the court personally or by counsel for the purpose of making a statement or may submit a written statement. The statement shall relate solely to the facts of the case and any personal injuries or financial loss incurred by the victim." It is well settled that Section 557.041.2 is intended to *guarantee* the right of victims to testify or give a statement at a sentencing hearing. Fujimoto v. State, 407 S.W.3d 656, 662 (Mo. App. E.D. 2013); see also Edwards v. State, 794 S.W.2d 249, 251 (Mo. App. W.D. 1990); Figgins v. State, 858 S.W.2d 853, 856 (Mo. App. W.D. 1993); Sharp v. State, 908 S.W.2d 752, 756 (Mo. App. E.D. 1995). Thus, Section 557.041.2 confers a victim the right to give a statement if the statute's test is met. See Fujimoto, 407 S.W.3d at 662. However, the statute "does not restrict or modify the common-law rule that '[a] judge may appropriately conduct an inquiry, broad in scope, largely unlimited in nature either as to the kind of information he may consider, or the source from which it may come.'" Id. (quoting Sharp, 908 S.W.2d at 756). During the punishment phase of a trial, the trial court retains the discretion to admit whatever evidence it deems helpful to the jury in assessing punishment. State v. Strong, 142 S.W.3d 702, 720 (Mo. banc 2004).

17

Smith relies on State v. Voss, 488 S.W.3d 97 (Mo. App. E.D. 2016), for the proposition that Section 557.041.2 limits sentencing-related evidence to victims. In Voss, a woman gave an impact statement to the jury in the sentencing phase of a trial. Id. at 118–19. The woman's impact statement related to the defendant's prior bad acts, which resulted in the death of the woman's son. Id. However, the death of the woman's son was unrelated to the crime upon which the defendant was on trial—the defendant was on trial for murdering another victim. See id. This Court held that the woman was not a victim of the offenses and that her statement did not relate solely to the facts of the case; thus, the woman's statement did not qualify for admission to evidence under Section 557.041.2. Id. at 119–20. Because this Court could not "find any legal authority indicating [the woman's] statement was admissible on some other basis," we found an abuse of discretion. Id. at 120.

Voss is distinguishable for multiple reasons. Voss is factually distinguishable because the impact statement in that case related to the defendant's commission of uncharged prior bad acts that were wholly unrelated to the crime at issue in the trial. Although evidence of such prior bad acts might be relevant in the penalty phase of trial as history and character evidence under Section 557.036.3, the evidence is only admissible if the State proves, by a preponderance of the evidence, that the defendant engaged in the conduct alleged. State v. Doss, 394 S.W.3d 486, 496 (Mo. App. W.D. 2013). Here, the testimony of the emergency personnel was not history and character evidence, but it was "evidence concerning the impact of the crime upon ... others." See Section 557.036.3. Thus, the impact testimony here was plainly relevant as sentencing evidence under a different provision of Section 557.036.3. Further, we expressly noted in Voss that we were unable to "find any legal authority indicating [the woman's] statement was admissible on some other basis." Here, we have found two such legal bases for admitting the

18

evidence. First, <u>Voss</u> did not consider the well-settled rule that Section 557.041.2 is intended to *guarantee* the right of victims to testify or give a statement at a sentencing hearing, but the statute was not intended to otherwise limit the trial court's discretion to admit additional evidence. <u>Fujimoto</u>, 407 S.W.3d at 662. Applying that rule here, the trial court had the discretion to admit the impact testimony of the emergency personnel, which was relevant because it involved the impact of *Victim's* conditions on the emergency personnel. Second, the trial court wielded express statutory authority to admit "evidence concerning the impact of the crime upon the victim, the victim's family and others." Section 557.036.3. As discussed above, the testimony of the emergency personnel qualifies under Section 557.036.3. Because we rely on additional legal bases for admitting the impact evidence that were not present in <u>Voss</u>, we find <u>Voss</u> to be inapposite.

Smith has not shown the trial court's ruling—that the impact testimony of the emergency personnel was helpful in assessing punishment—to be so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration. <u>See Clark</u>, 197 S.W.3d at 599. Thus, we cannot find an abuse of discretion. Point Three is denied.

<u>Conclusion</u>

The judgment of the trial court is affirmed.

KURT S. ODENWALD, Judge

James M. Dowd, J., concurs.
Gary M. Gaertner, Jr., J., concurs.

19