

# In the Missouri Court of Appeals
# Eastern District

## DIVISION THREE

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | No. ED103053 |
| | ) | |
| Respondent, | ) | Appeal from the Circuit Court of |
| | ) | St. Charles County |
| vs. | ) | |
| | ) | |
| TERRY G. SMITH, | ) | Honorable Ted House |
| | ) | |
| Appellant. | ) | Filed: December 20, 2016 |

### Introduction

Appellant Terry G. Smith ("Smith") appeals the judgment of the trial court following a jury trial in which he was convicted of first-degree endangering the welfare of his child ("Victim"). Smith's appeal mirrors an appeal filed by his wife, Victoria Smith ("Wife"), in this Court,[1] in which she raised identical issues. In his appeal, Smith asserts three points: (1) the State presented insufficient evidence at trial to support his conviction; (2) the trial court abused its discretion when it allowed first responders to provide victim impact testimony during the penalty phase of trial; and (3) the trial court plainly erred in allowing expert testimony that keeping Victim in an enclosure posed a significant risk to his physical, psychological, and emotional health because it invaded the province of the jury. We affirm the trial court's judgment.

---

[1] This Court issued its opinion in *State of Missouri v. Victoria Smith*, ED103039, 2016 WL 4527588, on August 30, 2016.

1

Factual and Procedural History

We reiterate the facts in *State of Missouri v. Victoria Smith*, ED103039, 2016 WL 4527588 ("*Smith I*"),[2] in that they are similar to this appeal. The following facts, when viewed in the light most favorable to the verdict, were presented at trial:

Smith lived with Wife and their six children, including their six-year-old son, Victim. Victim is a child on the autism spectrum. Deondus Towers ("Towers"), a certified nurse assistant, cared for Victim after school on weekdays and all day on weekends. Occasionally, Towers cared for Victim outside of Victim's home. Towers would take Victim to the mall, to Towers's son's football games, and to the park. Whenever Victim was with Towers, Victim was well behaved. Victim acted like a "typical kid" at Towers's home: he used the bathroom, slept in Towers's son's bed, and ate at restaurants without incident. Victim would often smell of urine when Towers picked him up from Smith's home, and he had feces on his body. Towers would often bathe Victim at her home, then take him home clean. This occurred on more than one occasion.

One weekend, Towers was unable to care for Victim. When Towers resumed her care, she learned that Victim had been kept in an enclosed bed all weekend. Towers asked Smith to show her Victim's sleeping arrangements. Towers followed Smith into the basement, and Towers immediately noticed a foul smell. Towers characterized the smell as worse than monkeys at the zoo. Towers noticed that the top of Victim's bed was enclosed to prevent escape and that there was no access to the bed in case of an emergency. Smith told Towers that he modified the bed so Victim would not get out. After seeing Victim's sleeping arrangements, Towers called the child abuse hotline.

---

[2] Smith and Wife were both charged with first-degree endangering the welfare of Victim. Smith and Wife were tried together in a single trial in which the State's evidence was introduced against both defendants. Wife subsequently appealed her conviction to this Court. Thereafter, this Court issued an opinion affirming Wife's conviction. Rehearing and/or transfer to the Missouri Supreme Court was denied on October 13, 2016.

Child Abuse Investigator Kenneth Spellmeyer ("Spellmeyer") and Officer Richard DeWitt ("DeWitt") responded to the hotline call and went to Smith's home. Merilyn Jones ("Jones"), Wife's mother, answered the door and explained that she was caring for the children while the parents were shopping. Jones, a sixty-nine-year-old, indicated she was unable to go up or down the stairs due to a recent stroke. Jones admitted it was difficult to care for the children. When asked about Victim, Jones explained he was kept in the enclosed bed in the basement because he is autistic. Jones allowed Spellmeyer and DeWitt into the basement; the smell of urine was apparent to them upon entering the home, and became stronger as they descended into the basement.

In the basement, Victim was laying naked in his bed because his diaper had been removed. A metal structure enclosed the top of the bed, which measured three feet high, three feet wide, and six feet long. Zip-ties, rope, and plywood secured the metal bars. Feces and urine covered the bed. Spellmeyer characterized the bed as "exceptionally unsafe." Jones saw no problem with the bed but admitted not knowing how to remove Victim in the event of an emergency. Two of Victim's siblings stated that Victim rarely left the enclosed bed. The family fed Victim hot dogs or chicken nuggets through the metal bars.

In order to remove Victim from the enclosed bed, the officers had to cut through the zip-ties securing the metal bars. As they did so, a large amount of urine "poured" out from the bedding. Paramedics cleaned Victim with towels and transported him to the hospital.

Fire Marshal Mark Morrison ("Morrison") testified at trial that the basement was inappropriate for a bedroom because the basement's windows did not permit egress if a fire occurred. Recognizing that Victim was unable to get out of the enclosed bed, Morrison opined that the enclosed bed would have hampered a rescue attempt in the event of a fire.

3

The State also called Dr. John Constantino ("Dr. Constantino"), a professor of psychiatry and pediatrics, as an expert witness. Dr. Constantino testified regarding the relationship between environmental factors and the severity of autism, emphasizing that the ability of autistic children to adapt is "profoundly influenced" by their environment. In addition to exposure to infectious diseases, Dr. Constantino opined that Victim's environment likely exacerbated his condition and—to a reasonable degree of medical certainty—posed a significant risk to his physical, psychological, and emotional health and well-being. Defense counsel objected to this testimony, arguing that Dr. Constantino was "invading the province of the jury." The trial court overruled the objection.

Dr. David Easterday ("Dr. Easterday") testified for the defense. Dr. Easterday diagnosed Victim with autism and is Victim's primary care physician. Dr. Easterday recognized that the enclosed bed presented a safety concern had Victim suffered a medical emergency. Dr. Easterday admitted he would have called the child abuse hotline if he had seen Victim's living arrangements in the enclosed bed. Dr. Easterday opined that sitting in an enclosed bed for three hours without a caregiver being able to remove Victim would have endangered Victim.

A jury convicted Smith of first-degree endangering the welfare of a child. After the jury's guilty verdict, the case proceeded to the penalty phase for jury sentencing.

The State called Spellmeyer, the Children's Division investigator, as a witness. Defense counsel objected that Spellmeyer's testimony was improper because he was not a victim, was not related to the victim, and was not able to testify about Smith's character or personal history. The trial court, over frequent objections, allowed Spellmeyer to testify. Spellmeyer testified that he had never "encountered a family that seemed to disregard care of the general responsibility for their actions." Spellmeyer compared this situation to his own brother-in-law, who is also on the autism spectrum, and stated that he thought of this case every time he walked past a dog cage.

4

Several additional emergency personnel testified over objection about how this case had affected their lives. Sergeant David Buehrle ("Buehrle") testified, "[This case] played a part of my decision to retire a year later. This gets old, it gets tiring, and I didn't want to see it anymore." Lieutenant Jeff Lange ("Lange") recounted how this case made him break down and how he would never forget the first sight of Victim. Paramedic Greg Pendleton ("Pendleton") testified that he would never forget Victim: "So any time I see a child with any disability, not just autism, I see [Victim]. And I—it's been a long time. And my one greatest wish was to find some closure. And today that has been granted to me." Paramedic Lisa Cassidy ("Cassidy") expressed similar feelings: "[There are] some things you can't unsee . . . in sixteen years, I've never seen anything like that. It was inhumane to me. And I've seen a lot of things."

The jury recommended the maximum sentence of seven years' imprisonment and a fine to be determined by the trial court. The trial court accepted the recommendation of seven years and imposed a $500 fine.

On August 30, 2016, this Court issued an opinion in *Smith I* in which we affirmed the trial court's judgment against Wife. *Smith I*, 2016 WL 4527588, at *9. The three issues Smith raises on appeal mirror those raised in Wife's appeal. Thus, after fully reviewing the record as it relates to Smith's appeal, we adopt portions of this Court's well-reasoned holding in *Smith I* as set forth below.

<u>Points on Appeal</u>

In his first point, Smith argues the trial court erred when it denied his motion for judgment of acquittal because the State failed to prove beyond a reasonable doubt that he committed the crime of first-degree endangering the welfare of a child. In his second point, Smith argues the trial court abused its discretion when it allowed victim impact testimony from Spellmeyer, Buehrle,

5

Lange, Pendleton, and Cassidy. Specifically, Smith asserts that these individuals, who were first responders, were not entitled to give victim impact testimony during the penalty phase of trial under sections 557.036 RSMo (Cum. Supp. 2007),[3] 595.200, or 557.041. In his third point, Smith argues the trial court plainly erred in overruling defense counsel's objection to Dr. Constantino's testimony that keeping Victim in the enclosure was a significant risk to his physical, psychological, and emotional health because it invaded the province of the jury.

## Discussion

### I.  Point One—Sufficiency of the Evidence

In his first point, Smith argues the trial court erred when it denied his motion for judgment of acquittal because the State failed to prove beyond a reasonable doubt that he committed the crime of first-degree endangering the welfare of a child. Specifically, Smith asserts the State failed to prove he knowingly acted in a manner that created a substantial risk to the life, body, or health of Victim by keeping him in an enclosure with urine and feces.

#### A.  Standard of Review

To determine whether the State presented sufficient evidence to sustain a conviction, we consider each of the elements of the crime. *State v. Grim*, 854 S.W.2d 403, 411 (Mo. banc 1993). We review the evidence in the light most favorable to the State and grant the State all reasonable inferences from the evidence. *Id.* We disregard any evidence and inferences that are contrary to the verdict. *State v. Miller*, 372 S.W.3d 455, 463 (Mo. banc 2012). On appeal, we do not act as a "super juror" with veto powers; the jury's decision is entitled to great deference. *Id.* Thus, our inquiry is not whether we believe the defendant's guilt, but whether any rational juror could have found the crime's essential elements beyond a reasonable doubt. *Id.*

---

[3] All statutory references are to RSMo (2000), unless otherwise indicated.

B.  Analysis

A person is guilty of first-degree endangering the welfare of a child if that person "knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old." Section 586.045.1(1). "The elements of this offense are that (1) the defendant engaged in conduct, (2) in so doing, the defendant created a substantial risk to the life, body, or health of a child, (3) the victim was less than seventeen years old, and (4) the defendant acted knowingly with respect to the facts and circumstances." *State v. Short*, 186 S.W.3d 828, 830–31 (Mo. App. E.D. 2006). Only the second and fourth elements are at issue on appeal. We address these two element in turn.

### 1.  Substantial Risk to the Life, Body, or Health of Victim

We first consider whether the State presented sufficient evidence that keeping Victim in the enclosed bed with urine and feces created a substantial risk to his life, body, or health.

Section 568.045.1(1) does not require a victim to sustain an injury; rather, the defendant's actions must create only a substantial risk of harm to be actionable. *State v. Hopson*, 168 S.W.3d 557, 563 (Mo. App. E.D. 2005). "In the context of the child endangerment statute, *substantial* means not seeming or imaginary and *risk* means the possibility of loss, injury disadvantage or destruction." *State v. Randle*, 456 S.W.3d 535, 542–43 (Mo. App. E.D. 2015) (internal quotation omitted) (emphasis in original). Health, as used in section 568.045.1(1), includes a child's physical, mental, emotional, or psychological condition. *State v. Loughridge*, 395 S.W.3d 605, 609 (Mo. App. S.D. 2013). When determining whether a defendant's actions created a substantial risk to the life, body, or health of a child, we consider the totality of the circumstances from the evidence presented. *Randle*, 456 S.W.3d at 543.

7

Based on the totality of the circumstances, we find that sufficient evidence was presented from which a reasonable juror could conclude that Victim's living conditions created a substantial risk to his life, body, or health. Regarding Victim's life, the State presented evidence that Smith kept Victim in an enclosed, improvised bed made of metal bars and plywood, and secured with bungee cords and zip ties. Sergeant Buehrle testified he tried "everything possible" to open the enclosure, including pulling on the metal bars and straps, and searching for a hidden latch under the bed. Buehrle testified they eventually freed Victim by cutting the zip ties and taking the roof off the bed. Fire Marshall Morrison testified the basement was not an appropriate bedroom because the windows would not allow egress in an emergency situation. Morrison opined that in the case of a fire, keeping Victim in a locked enclosure in the basement with no means of egress would not only entirely prevent self-preservation or self-evacuation, but also hinder firefighters' attempts to rescue Victim. Furthermore, Victim's caretaker, Jones, could not quickly reach Victim in an emergency situation because she could not go up or down the stairs due to a recent stroke. Even if Jones could have reached Victim in an emergency, she admitted to officers that she did not know how to open the enclosure. Because Smith left Victim with an inadequate caretaker, and kept Victim in an enclosure without the ability to exit or be quickly removed in an emergency, a reasonable juror could conclude that Smith's actions created a substantial risk to Victim's life.

Additionally, the State presented sufficient evidence of a substantial risk to Victim's physical health. Officers testified that there was a strong smell of urine upon entering the home, which became more intense as they went into the basement. Officers testified Victim was sitting naked in the enclosure in his own urine and feces. Investigator Spellmeyer testified there was fresh and hardened feces smeared across the metal bars and inside the enclosure. The mattress was also saturated with urine, and urine "poured" out of the metal bars and all over the floor when officers

8

dismantled the bed. Dr. Constantino testified it is a health risk for a child to be exposed to feces because it could lead to infectious diseases, gastrointestinal diseases, and skin diseases. Pendleton testified that constant urine on the body can lead to a breakdown of the skin. Furthermore, Dr. Easterday, the Victim's primary care physician, acknowledged that had he observed Victim in the unsanitary enclosure, he also would have called the child abuse hotline. Based on this evidence, a reasonable juror could conclude that the unsanitary condition of Victim's living environment posed a real and substantial risk to his physical health.

Finally, the State presented sufficient evidence of a substantial risk to the Victim's psychological health. Dr. Constantino testified that children on the autism spectrum are very sensitive to their environment, and their capacity to adapt, respond, and learn are "profoundly influenced" by their environment. Dr. Constantino testified that keeping a child with autism contained, and depriving him of socialization and interaction, can exacerbate his symptoms. There also was testimony that Jones indicated Victim was put in the enclosure on a daily basis when he returned home from school because that was the only way he could be controlled. Further, there was evidence that two of Victim's siblings indicated that Victim "was rarely out of the cage," and the children would feed him chicken nuggets or hot dogs through the metal bars. Moreover, Victim's regular caregiver, Towers, testified that despite being autistic, the Victim was well-behaved and acted like a "typical kid" at her home: he used the bathroom, slept in her son's bed, and ate at restaurants. Towers testified she took Victim to the mall, her son's football games, and to the park. Towers stated Victim's demeanor would change when she took him home, and he would fight and act out when it was time for bed. Based on the difference in Victim's behavior with Towers and while at home with Smith, a reasonable juror could find that continuously and

9

unnecessarily keeping Victim in an enclosure with urine and feces presented a substantial risk to his psychological health.

Accordingly, we find the State presented sufficient evidence from which a reasonable juror could conclude that Smith's actions created a substantial risk to Victim's life, and physical and psychological health.

### 2. Smith Acted Knowingly

We next consider whether the State presented sufficient evidence to prove that Smith knowingly acted in a manner that created the substantial risk of harm to Victim.

Section 562.016.3 provides that a person "acts knowingly" or with knowledge, "(1) With respect to his conduct or to attendant circumstances when he is aware of the nature of his conduct or that those circumstances exist; or (2) With respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." There is no bright-line test to determine whether a person's actions knowingly create a substantial risk to the victim. *State v. Burrell*, 160 S.W.3d 798, 802 (Mo. banc 2005). In making this determination, we look at the totality of the circumstances. *Id.* "The State may prove a defendant's knowledge by direct evidence and reasonable inferences drawn from the circumstances surrounding the incident." *Id.* Direct evidence of a person's mental state "is seldom available, and such intent is usually inferred from circumstantial evidence." *State v. Rinehart*, 383 S.W.3d 95, 103 (Mo. App. W.D. 2012) (internal citation omitted). A person's mental state also may be reasonably inferred from the act itself. *Id.*

We find sufficient evidence was presented to prove Smith knowingly created a risk to Victim based on Smith's actions as well as the highly unsanitary conditions in which Victim was found. First, Smith knowingly left Victim with Jones who admitted she could not remove Victim from the enclosure in the case of an emergency. Smith told Towers he modified the enclosed bed

10

with zip-ties, rope, and plywood so Victim would not get out. Further, "a fact-finder may . . . make inferences regarding a defendant's level of awareness based on the child's appearance." *Rinehart*, 383 S.W.3d at 103. When officers found Victim, he was in the basement, which reeked of urine, and he was laying naked in the small enclosure. There was hardened feces smeared across the metal bars and inside the bed, and the mattress was soaked with urine. Thus, the fact that Victim was found laying naked in a cramped, modified enclosure that was clearly not cleaned on a regular basis supports a reasonable inference that Smith acted knowingly.

Further, "[a] defendant's prior similar acts, along with the totality of the circumstances surrounding the incident at issue, could lead a jury to determine that [the defendant] acted knowingly in repeating the same action at a later time." *Id.* (internal quotation omitted). Here, Towers testified Victim would often smell of urine when she picked him up from Smith's home, and she would see feces on his body. Towers would bathe Victim at her home and bring Victim home clean. However, Victim would again smell badly the next time she saw him. Additionally, on one occasion, Towers was unable to care for Victim, and when she resumed her care, she was told Victim had been kept in the enclosed bed all weekend. Victim's siblings stated Victim rarely left the enclosed bed, and they would feed him hot dogs or chicken nuggets through the metal bars. Further, Towers testified that she witnessed Smith warm up Victim's food, and place it on the floor beside a dog's bowl for Victim to eat. Smith told Towers that Victim would not sit at the table to eat. This evidence suggests that Smith's actions were not isolated incidents but rather reflect Victim's everyday living environment at home. Looking at the totality of the circumstances, including Smith's modification of the enclosed bed, Victim's physical appearance when officers found him, and Smith's prior similar acts of subjecting Victim to unsanitary living conditions,

there is sufficient evidence to support a reasonable inference that Smith knowingly acted in a manner that created a substantial risk of harm to Victim.

Smith challenges his conviction by arguing that he could not afford a more expensive medical bed, and he modified the enclosed bed in order to keep Victim safe. In *State of Missouri v. Victoria Smith*, this Court recognized "the challenges of caring for a severely autistic child, with or without limited financial means." *Smith I*, 2016 WL 4527588, at *6. However, this in no way justifies Smith's actions of regularly locking Victim in a modified, enclosed bed surrounded by large amounts of urine and feces. *See id.* This case did not merely turn on the fact that Victim was contained in an enclosed bed. Rather, the evidence presented to the jury painted a different picture. The jury was presented with evidence that Victim was found in the cramped enclosure, which was covered in urine and feces, and officers had to cut the top off to free Victim. The fire marshal testified that keeping Victim in a locked enclosure in the basement with no means of egress put Victim's life at risk in the event of an emergency. Evidence was presented that Smith left Victim with an inadequate caretaker who admittedly did not know how to open the enclosure, and was unable to go up and down the stairs. The jury also heard evidence that Victim was fed through the bars of the cage, and Towers testified that she observed Smith feeding Victim on the floor beside a dog's bowl. It is not our job to second-guess the jury, and we are limited to viewing the evidence and reasonable inferences in the light most favorable to the State. *Grim*, 854 S.W.2d at 411. Accordingly, based on the totality of the circumstances, we find the State presented sufficient evidence to support Smith's conviction for first-degree endangering the welfare of a child. Point I is denied.

## II. Point Two—Penalty-Phase Testimony

In his second point, Smith argues the trial court abused its discretion when it allowed victim impact testimony from Spellmeyer, Buehrle, Lange, Pendleton, and Cassidy. Specifically, Smith asserts that these individuals, who were first responders, were not entitled to give victim impact testimony during the penalty phase of trial under sections 557.036, 595.200, or 557.041.

Our standard of review is for an abuse of discretion. *State v. Clark*, 197 S.W.3d 598, 599 (Mo. banc 2006). A trial court abuses its discretion when a "ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *Id.*

We agree with this Court's holding in *Smith I* and find the trial court did not abuse its discretion when it admitted the testimonies. Smith first argues that section 557.036[4] only allows victims and family members of the victim to provide victim impact testimony. However, in *Smith I*, this Court held that first responders qualify as "others" under the plain language of the statute, and thus section 557.036 does not limit the trial court's discretion to admit their testimonies. *Smith I*, 2016 WL 4527588, at *8. Smith also argues that section 557.041[5] prohibits the first responders from testifying during the penalty phase because they are not victims. In support of his argument, Smith relies on *State v. Voss*, 488 S.W.3d 97 (Mo. App. E.D. 2016), for the proposition that non-victims cannot give victim impact testimony. As found in *Smith I*, *Voss* is distinguishable from the present case. While section 557.041 is intended to guarantee the rights of a victim to give testimony

---

[4] Section 557.036 provides, in pertinent part:
> The issue at the second stage of the trial shall be the punishment to be assessed and declared. Evidence supporting or mitigating punishment may be presented. Such evidence may include . . . evidence concerning the impact of the crime upon the victim, the victim's family *and others* . . . .

(emphasis added).

[5] Section 557.041 provides, in pertinent part,
> [T]he victim of [a felony] offense may appear before the court personally or by counsel for the purpose of making a statement or may submit a written statement. The statement shall relate solely to the facts of the case and any personal injuries or financial loss incurred by the victim.

or make statements at a sentencing hearing, the statute does not limit the trial court's discretion to admit additional relevant evidence, and the trial court further has express statutory authority to admit the testimonies under section 557.036. *Id.* at \*8–9. We see no reason to depart from the holdings articulated in *Smith I* on this issue. Point II is denied.

## III.     Point Three—Expert Testimony

In his third point, Smith argues the trial court plainly erred in overruling defense counsel's objection to Dr. Constantino's testimony that keeping the Victim in the enclosure was a significant risk to his physical, psychological, and emotional health. Specifically, Smith argues the testimony invaded the province of the jury on the ultimate issue of whether there was a significant risk of harm to the Victim.

Smith concedes he did not preserve this issue for appeal because he did not include it in his motion for new trial. We have the discretion to review unpreserved issues for plain error. *State v. Baumruk*, 280 S.W.3d 600, 607 (Mo. banc 2009); Rule 30.20.[6] Plain errors are "evident, obvious and clear." *State v. White*, 247 S.W.3d 557, 561 (Mo. App. E.D. 2007). A request for plain-error review triggers a two-step analysis. *Id.* First, we review the claim on its face: whether the claim of error facially establishes substantial grounds for believing that a manifest injustice or miscarriage of justice occurred. *Id.* If facial grounds do not exist, we reject the appellant's claim. *Id.* However, if facial grounds exist, the second step of our analysis is to determine whether the manifest injustice or miscarriage of justice actually occurred. *Id.*

We first note that Smith's counsel conceded Point III during oral argument. Notwithstanding counsel's concession, however, we again agree with our colleagues in *Smith I* that Smith's claim fails under the first prong of the plain-error review. Notably, "Experts may

---

[6] All rule references are to Missouri Supreme Court Rules (2015) unless otherwise indicated.

testify to ultimate issues in a case so long as it aids the jury and does not invade its province. . . . An expert may not substitute his reasoning and conclusions for the reasoning and conclusions of the jury upon the issue, or issues, before the triers of fact." *Smith I*, 2016 WL 4527588, at *7 (citing *State v. Cochran*, 365 S.W.3d 628, 633–34 (Mo. App. W.D. 2012)). Like *Smith I*, we find that the trial court could reasonably conclude that the effect of an environment on autistic children is outside the purview of a typical juror, and that Dr. Constantino's testimony concerning the risks of the Victim's environment on his autism aided the jury. *Id.* Likewise, Dr. Constantino's testimony did not invade the province of the jury because he neither testified about Smith's guilt, innocence, or state of mind nor did he substitute his reasoning and conclusions for that of the jury. *Id.* at *8. Dr. Constantino only opined that Victim's environment likely exacerbated his condition—and to a reasonable degree of medical certainty—posed a significant risk to his physical, psychological, and emotional health and well-being. Similar to *Smith I*, we find no error. Point III is denied.

## Conclusion

We affirm the judgment of the trial court.

_____
Angela T. Quigless, P.J.

Robert G. Dowd, Jr., J., and
Lisa S. Van Amburg, J., Concur

15