

# IN THE MISSOURI COURT OF APPEALS
# WESTERN DISTRICT

| | | |
|---|---|---|
| STATE OF MISSOURI, | ) | |
| Respondent, | ) | |
| | ) | |
| v. | ) | WD82796 |
| | ) | |
| JOSEPH GONSALEZ, | ) | FILED: March 23, 2021 |
| Appellant. | ) | |

**Appeal from the Circuit Court of Jackson County**
**The Honorable Sandra C. Midkiff, Judge**

**Before Division One: Alok Ahuja, P.J., and**
**Thomas H. Newton and Thomas N. Chapman, JJ.**

Following a jury trial in the Circuit Court of Jackson County, Joseph Gonsalez was convicted of voluntary manslaughter, first-degree endangering the welfare of a child, and two counts of armed criminal action. Gonsalez appeals. He challenges the sufficiency of the evidence to support his conviction of child endangerment, and the wording of the instruction used to submit child endangerment to the jury. Gonsalez also argues that the circuit court's judgment incorrectly states the felony classification of his voluntary manslaughter conviction. We affirm Gonsalez's child endangerment conviction. We vacate the judgment and remand to the circuit court, however, to permit the court to enter a judgment *nunc pro tunc* accurately reporting Gonsalez's conviction for voluntary manslaughter.

**Factual Background**[1]

Joseph Gonsalez and E.R. met in 2014 and began an on-again-off-again relationship that would continue over the next four years. Gonsalez and E.R. shared a son, J.G., born in July 2015. The couple lived together for a period of time. In 2017, however, E.R. moved to live with her mother after a domestic violence incident, and Gonsalez moved back to his parents' house in southern Kansas City. E.R. sought and obtained a protective order against Gonsalez, and Gonsalez filed a custody case regarding J.G. Under the protective order and the parties' custody arrangement, Gonsalez and E.R. were required to exchange J.G. through a third-party organization, although they eventually began to exchange J.G. directly at Gonsalez's parents' house.

In January 2018, Gonsalez and E.R. remained in contact but were not in a romantic relationship. E.R.'s best friend testified that, at the time, Gonsalez "was being obsessive, calling [E.R.] a lot," and that E.R. did not like it, and felt that she was constantly "being attacked."

On January 5, 2018, E.R.'s father suffered a broken leg and required hospitalization. Although Gonsalez was not scheduled to have custody of J.G. until the following day, E.R. called him to see if he could take J.G. a day early so she could stay with her father at the hospital. Gonsalez refused, and the couple began to argue. E.R.'s best friend agreed to watch J.G. while E.R. was with her father. Gonsalez and E.R. agreed that E.R. would bring J.G. to Gonsalez's parents' house the following day.

Later on January 5, Gonsalez went to a Home Depot hardware store and purchased duct tape. At trial, Gonsalez testified that he bought the duct tape

---

[1] On appeal, "'[t]he evidence and all reasonable inferences therefrom are viewed in the light most favorable to the verdict, disregarding any evidence and inferences contrary to the verdict.'" *State v. Stewart*, 560 S.W.3d 531, 533 (Mo. 2018) (quoting *State v. Wright*, 382 S.W.3d 902, 903 (Mo. 2012)).

because he planned to bind E.R. when she brought J.G. over the next day, and that his "main reason" for doing so was to enable him to go through her cell phone. He also hoped that the couple would have consensual sex; Gonsalez claimed that they had previously engaged in sexual acts in which E.R. was restrained. E.R.'s best friend testified that she and E.R. had discussed E.R.'s sex life with Gonsalez; her friend testified that E.R. "did not enjoy" being tied up or bound.

E.R. spent the night of January 5-6, 2018, at her best friend's home. Early on the morning of January 6, Gonsalez called E.R. and they argued about E.R. being late to bring J.G. to his parents' home. E.R.'s best friend testified that Gonsalez was angry, and yelled at E.R. E.R. left her best friend's house shortly thereafter to exchange J.G. with Gonsalez. She told her friend "that she would be right back"; E.R. and her friend then planned to go get coffee together.

Gonsalez told his parents that E.R. was coming over to bring J.G. and to talk; he requested that they leave so he and E.R. could have some privacy. Gonsalez's parents left the house, planning to return in approximately one hour.

E.R. entered Gonsalez's parents' home through the basement and went upstairs to the main floor. Gonsalez had been in his bedroom on the upper level of the home. He descended and met E.R. as she was coming up the stairs to the main floor. Gonsalez testified that he picked up J.G., who was walking beside E.R. Gonsalez testified that he took J.G. upstairs to Gonsalez's bedroom, which was the northwest of three bedrooms on the upper floor. Gonsalez took off J.G.'s shoes and placed him down to play. After doing so, Gonsalez picked up a loaded .38 caliber handgun that was on a nightstand in his bedroom and placed it on a television stand in the guest bedroom (the northeast upstairs bedroom) across the hall from his room.

Gonsalez testified that he then met E.R. as she was coming up the stairs to the bedrooms on the upper level. They talked about their relationship, and soon

began to argue. In his testimony, Gonsalez claimed that despite the argument, he and E.R. were planning to have sex, and began to undress in the guest bedroom. Gonsalez testified that E.R. agreed to be tied up. Gonsalez retrieved the duct tape from his bedroom and went back to the guest bedroom. He testified that E.R. became upset upon seeing the duct tape, and did not wish to continue. Although she resisted, Gonsalez testified that he tied E.R.'s wrists behind her body, and then bound her arms to her body with the duct tape. Gonsalez pushed her onto the bed, grabbed her cell phone, and went into the hallway to look through it. When E.R. started yelling, Gonsalez went back into the bedroom and placed duct tape over her mouth.

Gonsalez testified that as he went back into the hallway to continue going through E.R.'s phone, he heard a sound and as he turned around, E.R. shot him in the abdomen (although her wrists were bound behind her back, and her arms were restrained against her body). Gonsalez testified that E.R. dropped the gun and ran downstairs to the main floor. Gonsalez testified that he panicked, and picked up the gun and ran after her. Gonsalez shot E.R. in the head at point blank range in the living room. The medical examiner testified that E.R.'s head wound was a contact wound, meaning the barrel of the gun was in contact with the skin surface when the gun was discharged.

Gonsalez testified that he ran back upstairs to his bedroom to grab his keys to leave. Gonsalez testified that J.G. was in the bedroom when he opened the door, and that he left without shutting the bedroom door behind him. Gonsalez left in E.R.'s car. He drove to a friend's nearby house seeking help for his abdominal wound. When he discovered his friend was not home, Gonsalez flagged down a passerby, who called 9-1-1 around 11:02 a.m.

While Gonsalez's parents were out, his mother had several missed calls from Gonsalez. Gonsalez's mother attempted to return the missed calls twice, and

4

connected with Gonsalez on her second attempt at approximately 10:48 a.m. After Gonsalez answered the phone, his mother heard him arguing with E.R., and then a gunshot. Gonsalez's parents rushed home from Overland Park, where they were visiting with their daughter.

When Gonsalez's parents arrived home, they found E.R.'s body in the living room surrounded by a pool of blood. E.R. was naked from the waist down. Gonsalez's mother testified that when they entered, J.G. was "nearby," sitting on the floor next to E.R.'s body. Gonsalez's father (who had entered the house first) testified that he saw J.G. walking in the kitchen and the living room. J.G. did not appear upset. Gonsalez's father picked J.G. up and held him outside the house as they waited for first responders to arrive. Police were dispatched to Gonsalez's parent's house around 11:13 a.m. A Kansas City Police Detective observed that J.G. had a small golf-ball-sized patch of blood on one leg of his pants.

During their investigation, crime scene investigators discovered two bullet holes in the home. The first was in the living room ceiling, above a couch on which particles of drywall were scattered. Investigators cut out the ceiling to gain access to the attic area above, but did not recover any further evidence. Investigators found a second bullet hole in a closet door in the upstairs hallway near the bedrooms. Investigators determined that the bullet entered the closet, shattered a glass vase holding a candle, and continued through the wall into an adjoining bathroom. In the bathroom, investigators found a bullet hole on the wall above the sink, and found a spent bullet inside a toilet paper roll located on top of the sink.

Police recovered a .38 caliber revolver in the northeast guest bedroom, with two spent casings inside the cylinder. Investigators determined that the spent bullet recovered in the upstairs bathroom had been fired from that gun. Testing of the trigger area of the revolver identified E.R. as a major DNA contributor, and Gonsalez as one of three minor contributors.

On February 2, 2018, Gonsalez was charged by indictment with four counts: first-degree murder (Count I); first-degree endangering the welfare of a child (Count III); and two associated counts of armed criminal action (Counts II and IV). As to Count III, the State charged Gonsalez with endangering the welfare of a child "by discharging a firearm in the presence of J.G."

After a six-day guilt-phase trial, the jury found Gonsalez guilty on Count I of the lesser-included offense of voluntary manslaughter. The jury also convicted him of the other three charges (endangering the welfare of a child in the first-degree, and two counts of armed criminal action). After a further penalty phase, the jury recommended that Gonsalez be sentenced to fifteen years' imprisonment for voluntary manslaughter; twenty-five years for the associated count of armed criminal action; seven years for endangering the welfare of a child; and seven years for the second armed criminal action charge. The circuit court imposed the sentences recommended by the jury, and ordered all of the sentences to run consecutively.

Gonsalez appeals.

## Discussion

Gonsalez asserts three Points on appeal. His first Point argues that the evidence was insufficient to support his conviction for endangering the welfare of a child. His second Point argues that the verdict director for child endangerment was erroneous, requiring a new trial. Finally, in Point III Gonsalez argues that the circuit court's judgment erroneously refers to voluntary manslaughter as a class A felony.

## I.

Gonsalez argues that the evidence was insufficient to convict him of child endangerment because there is no evidence establishing where J.G. was in the home at the moment Gonsalez fired the shot that killed E.R. Gonsalez contends

6

that the evidence is therefore insufficient to establish beyond a reasonable doubt that his discharge of the gun created a substantial risk to J.G.'s life, body or health.

"To determine whether the evidence presented was sufficient to support a conviction . . . this Court does not weigh the evidence but, rather, accepts as true all evidence tending to prove guilt together with all reasonable inferences that support the verdict, and ignores all contrary evidence and inferences." *State v. Naylor*, 510 S.W.3d 855, 858-59 (Mo. 2017) (citations and internal quotation marks omitted). "This Court will not . . . supply missing evidence, or give the State the benefit of unreasonable, speculative or forced inferences." *State v. Davis*, 564 S.W.3d 649, 652 (Mo. App. W.D. 2018) (citation and internal quotation marks omitted). Our sole inquiry is to determine whether "any rational fact-finder could have found the essential elements of the crime beyond a reasonable doubt." *State v. Stewart*, 560 S.W.3d 531, 533 (Mo. 2018) (citation and internal quotation marks omitted).

The State charged Gonsalez with first-degree endangering the welfare of a child under § 568.045.[2] The offense requires that a person "[k]nowingly act[ ] in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years of age." § 568.045.1(1).

"In the context of the child endangerment statute, *substantial* means 'not seeming or imaginary' and *risk* means 'the possibility of loss, injury, disadvantage or destruction.'" *State v. Randle*, 456 S.W.3d 535, 542-43 (Mo. App. E.D. 2015) (citation omitted). "A substantial risk is an actual or 'practically certain' risk" and "may exist even though the risk does not materialize into actual harm." *State v. Welch*, 600 S.W.3d 796, 813 (Mo. App. E.D. 2020) (citations and internal quotation marks omitted.) While actual harm to the child is not required, this Court has emphasized that

---

[2] Statutory citations refer to the 2016 edition of the Revised Statutes of Missouri, updated by the 2017 Supplement.

7

"[t]he criminal statutes for child endangerment are meant to apply to situations where [a person] creates an actual risk to the life, body, or health of a child. They are not meant to apply to situations where there is only the potential for risk to the health of the child."

*Carmons v. State*, 26 S.W.3d 382, 385 (Mo. App. W.D. 2000) (quoting *State v. Wilson*, 920 S.W.2d 177, 180 (Mo. App. W.D. 1996)).

The indictment alleged that Gonsalez had committed the offense of child endangerment "by discharging a firearm in the presence of J.G." While the State could have alleged that Gonsalez committed child endangerment in other ways (such as by abandoning J.G. in a home with his deceased mother and a loaded handgun), "this Court will review Appellant's [sufficiency-of-the-evidence] claim based upon how the crime was charged." *State v. Zetina-Torres*, 482 S.W.3d 801, 809 (Mo. 2016).

Gonsalez's first Point assumes that the only gunshot that could support his child-endangerment conviction is the shot that killed E.R., which was fired in the living room of the main floor of the house. If Gonsalez's child-endangerment conviction was predicated on that gunshot, his sufficiency-of-the-evidence argument might have some force: the evidence indicated that this gunshot was fired with the gun against E.R.'s head; the bullet apparently exited E.R.'s head and entered an unoccupied overhead attic space; and the evidence is limited that J.G. was physically present when the fatal shot was fired. It is arguable whether the evidence was sufficient to show that the fatal gunshot "create[d] a substantial risk to the life, body, or health of" J.G., as required by § 568.045.1(1).

But the evidence at trial established that the gun was fired not only once, but at least twice. One of the shots was discharged in an upstairs hallway, entered a closet, and exited into an adjoining bathroom. Although Gonsalez denied that he had fired this shot, the jury was not required to believe this aspect of his testimony. *See, e.g.*, *State v. Shaddox*, 598 S.W.3d 691, 694 n.2 (Mo. App. S.D. 2020); *State v.*

8

*Demery*, 568 S.W.3d 552, 556 (Mo. App. E.D. 2019).  And the evidence was plainly sufficient for the jury to conclude that Gonsalez fired the upstairs shot, since the gun was his; he admitted to moving the gun from his bedroom to the guest room shortly before the shot was fired; his DNA was found in the trigger area of the gun; E.R. was tightly bound with duct tape, with her hands behind her back, at the time the shot was fired; and Gonsalez acknowledged using the gun to fire the shot which killed E.R. only moments later.

Gonsalez argues that the jury necessarily found that he had _not_ fired the gunshot in the upstairs hallway, because the jury convicted him on Count I of only voluntary manslaughter, meaning that it found that "he . . . caused [E.R.'s] death under the influence of sudden passion arising from adequate cause."  § 565.023.1(1).  Gonsalez argues that the only evidence of "sudden passion" before the jury was E.R.'s shooting of Gonsalez.  Thus, Gonsalez contends that the jury's verdict on Count I shows that the jury found that E.R. fired the upstairs shot.  It is not at all clear, however, that the jury's finding on Count I that Gonsalez acted "under the influence of sudden passion" necessarily means that jurors concluded that E.R. fired Gonsalez's gun in the upstairs hallway.  In any event, Gonsalez's argument ignores the general principle that, "'[w]hen a defendant is tried on a multiple count charge involving crimes with different elements, the jury's verdict does not have to be logically consistent.'"  *State v. Owens*, 270 S.W.3d 533, 540 (Mo. App. W.D. 2008) (quoting *State v. Flemons*, 144 S.W.3d 877, 882 (Mo. App. W.D. 2004)).  "[I]nconsistencies between verdicts on multiple counts in a criminal prosecution are not grounds for rejecting the individual verdicts; rather, the sufficiency of the evidence on each count is considered independently of the others."  *Id.* at 539.  The jury's verdict on Count I does not affect our consideration of the sufficiency of the evidence to convict Gonsalez on Count III.

9

The jury could reasonably find that the discharge of Gonsalez's gun in the upstairs hallway created a substantial risk to J.G.'s life, body, or health. The evidence would support the inference that this gunshot occurred as part of a heated altercation. Gonsalez testified that he had bound E.R. despite her resistance, and that she was upset and yelling at him. The jury could reasonably infer that Gonsalez was attempting to sexually assault E.R; that he had forcibly bound her and removed her pants and underwear; that she was seeking to escape from the upstairs bedroom where Gonsalez was attempting to confine her; and that his claim that a sexual encounter had begun consensually was a lie. The jury could also reasonably infer that the gunshot was fired in the upstairs hallway haphazardly, and as part of a struggle, since although it was Gonsalez's gun and he was in control of the situation, he ended up getting shot in the abdomen as part of the upstairs incident.

The evidence indicates that the discharge of the firearm upstairs occurred in close quarters. Gonsalez's parents' home was described as a duplex, and the living area on the upper floor was not as large as the main floor (since unoccupied attic space was located above the living room where Gonsalez fired the shot that killed E.R.). During the testimony of a crime scene investigator, almost 100 photographs of the interior of the home were introduced into evidence, as well as a three-page diagram of the home (including one copy of the diagram on which the investigator had marked the trajectory of the gunshot fired upstairs). Gonsalez has not provided this Court with any of these exhibits, which would illustrate the layout of the duplex where the gun was discharged. We presume those exhibits would not be helpful to Gonsalez's arguments on appeal. *See, e.g.*, *State v. Evans*, 410 S.W.3d 258, 263-64 n.5 (Mo. App. W.D. 2013); *State v. Bryant*, 362 S.W.3d 46, 50 (Mo. App. S.D. 2012). Although the exhibits themselves were not admitted in evidence, the investigator's testimony indicates that he was able to capture the doorways leading

10

to all three upstairs bedrooms, as well as the doors of the closet and bathroom, in a single photograph taken in the hallway – suggesting that the space was not large.

In addition, the evidence indicated that the home's construction was not substantial. Thus, the testimony indicated that the front door to the home was hollow, as was the upstairs closet door. Moreover, the jury heard evidence that a bullet was able to travel through the closet door, through a glass vase containing a wax candle, and through the wall of the closet into a neighboring bathroom.

Finally, we note that, according to Gonsalez's own testimony, J.G. was in one of the upstairs bedrooms when the gun was discharged in the hallway.

Given the discharge of a firearm during a struggle; in the narrow confines of an upstairs hallway; in a home with insubstantial walls and doors; with J.G. nearby, a jury could reasonably infer that the discharge of the gun in the upstairs hallway created a substantial risk to J.G.

*State v. Welch*, 600 S.W.3d 796 (Mo. App. E.D. 2020), affirmed child-endangerment charges in similar circumstances. In *Welch*, the defendant lived in a mobile home with his girlfriend and their eight children. *Id.* at 802. While drunk, the defendant followed his girlfriend around the mobile home, waving a gun and pointing it at her, yelling that he was going to kill her. *Id.* at 803. The defendant later pointed the gun at one of his children, while two of his other children stood nearby. *Id.* The defendant then went into a bathroom and confronted a visitor to the mobile home; the defendant fired the gun three times while he and the visitor struggled over the gun. *Id.* at 803, 804. Some of these shots pierced walls of the mobile home. *Id.*

The Eastern District affirmed the defendant's second-degree child-endangerment conviction involving his five youngest children – who had remained in a bedroom as the altercation occurred. The Court explained:

11

> . . . Appellant fired three shots from his revolver in the bathroom of the mobile home while [the visitor] struggled with Appellant to point the gun away from him. Two shots traveled through the bathroom wall and into the adjacent bedroom that belonged to two of the children, J.R. and A.R. One of the shots traveled through the bedroom ceiling while the other continued through the opposite wall of the bedroom and into the living room, where it then went through the ceiling. Although the bullets did not travel into the bedroom where the five youngest children were located, in a shared bedroom on the other end of the trailer, . . . the jury still could have reasonably found that Appellant created a substantial risk to the life, body, or health of those children. Stray bullets traveling through walls in close quarters such as this mobile home . . . and firing shots while struggling and drunk were evidence enough of a risk of injury, both physical and emotional. . . . A reasonable juror could find that the children were at substantial risk of physical harm of stray bullets. . . . Several of the children testified that they heard the yelling and the gunshots and that they were scared as a result. Additionally, when Girlfriend checked on the children after Appellant left, she found they were all crying. Thus, there was sufficient evidence from which a reasonable juror could find that Appellant created a substantial risk of harm to the mental, emotional, or physical health of the children here.

*Id.* at 814.

As in *Welch*, Gonsalez fired a gunshot which traveled through at least one door and one wall in the upstairs portion of the home, while J.G. was nearby. Although we do not have a complete record to determine the exact layout of the home, we are justified in presuming that the home was a close and confined space comparable to the mobile home in *Welch*. Further, the gunshot occurred in the midst of an altercation between Gonsalez and E.R. in which the jury could find that he had forcibly bound her and removed some of her clothing. The evidence was sufficient for the jury to conclude that Gonsalez's actions created a substantial risk to the life, body, or health of J.G.

Point I is denied.

12

**II.**

In his second Point, Gonzales argues that the circuit court plainly erred in the manner in which it instructed the jury on the child endangerment offense.

Following the language of § 568.045.1(1), the verdict director for the child endangerment charge instructed the jury that it must find that Gonsalez's discharge of his gun "created a substantial risk to the life, body, or health of J.G." Gonsalez argues that by including the words "or health," the verdict director instructed the jury in the disjunctive, and permitted the jury to convict Gonsalez if it found that his conduct presented a substantial risk either to J.G.'s physical health, _or_ to his emotional or mental health. Gonsalez argues that there was insufficient evidence to prove a substantial risk of emotional harm to J.G., and that the jury should therefore not have been instructed on this option.

Gonsalez's counsel did not object to the child endangerment instruction at trial, and he did not allege instructional error in his motion for new trial. Therefore, we review Gonsalez's instructional error claim only for plain error.

> Rule 30.20 provides that "plain errors affecting substantial rights may be considered in the discretion of the court when the court finds that manifest injustice or miscarriage of justice has resulted therefrom." "Plain error review is discretionary and involves two steps: first, we must determine whether the trial court committed evident, obvious, and clear error affecting the defendant's substantial rights; second, if plain error is found, we then consider whether the error actually resulted in manifest injustice or a miscarriage of justice." "'When the unpreserved allegation concerns instructional error, plain error exists when it is clear that the circuit court has so misdirected or failed to instruct the jury that manifest injustice or miscarriage of justice has resulted.'" "The defendant bears the burden of showing that an alleged error has produced such a manifest injustice." "Instructional error seldom rises to the level of plain error."

*State v. Weyant*, 598 S.W.3d 675, 678 (Mo. App. W.D. 2020) (citations and footnote omitted).

Missouri courts have interpreted "health" as used in § 568.045.1(1) to encompass both a child's physical and emotional/psychological health. *See State v. Smith*, 505 S.W.3d 852, 857 (Mo. App. E.D. 2016); *State v. Loughridge*, 395 S.W.3d 605, 609 (Mo. App. S.D. 2013). Therefore, the verdict director for child endangerment would arguably have permitted the jury to convict Gonsalez based on his creation of a substantial risk *either* to J.G.'s physical or mental health.

There was no manifest injustice in this case, however, even if we assume that the instruction constituted a "disjunctive submission," and even if we further assume that there was insufficient evidence to permit the jury to find a substantial risk to J.G.'s mental health. There was no realistic prospect in this case that the challenged wording of the instruction affected the jury's verdict. The State's only argument as to the risk J.G. faced was focused on his physical health: the State contended that J.G. "could have been struck [by a bullet]. And that proves a substantial risk to the life, body, and health of [J.G.]." Neither the State, nor Gonsalez's counsel, ever suggested that the jury could convict Gonsalez of child endangerment because his conduct created a substantial risk to J.G.'s emotional or psychological health. In these circumstances, Gonsalez did not suffer a manifest injustice, even if we assume that the wording of the verdict director for child endangerment was somehow erroneous. *See, e.g.*, *State v. Henry*, 568 S.W.3d 464, 477 (Mo. App. E.D. 2019) ("While the instruction as written would allow the jury to convict Henry for the sodomy that occurred in the laundry room or bathroom . . ., we find the State's closing argument specifically directing the jury to the conduct in the laundry room prevented manifest injustice.").

Point II is denied.

### III.

In his third Point, Gonsalez argues that the circuit court's judgment erroneously states that the offense of voluntary manslaughter was a class A felony.

14

Gonsalez does not challenge the sentence the circuit court imposed for this offense, but only the felony classification assigned to the offense.

In reciting the jury's guilt determination, the judgment states that the "Charge Level" for voluntary manslaughter is "Felony B." In specifying Gonsalez's sentence on Count I, however, the judgment states that the offense is a "Felony A."

The State concedes that the circuit court's judgment erroneously refers to voluntary manslaughter as a class A felony. Section 565.023.3 expressly provides that "[t]he offense of voluntary manslaughter is a class B felony." The circuit court's reference to the offense as a "Felony A" in the sentencing portion of the judgment is clearly a clerical error. We also note an additional clerical error in the judgment: it refers to the offense of which Gonsalez was convicted on Count I as "Voluntary Manslaughter – 1st Degree." The offense of voluntary manslaughter has no degree gradations, however.

A *nunc pro tunc* judgment is appropriate to correct these defects in the judgment. As the Missouri Supreme Court has explained:

> Clerical errors in the sentence and judgment in a criminal case may be corrected by an order *nunc pro tunc* if the written judgment does not reflect what was actually done. . . . Rule 29.12(c) allows the court to amend its records according to the truth, so that they should accurately express the history of the proceedings which actually occurred prior to the appeal.

*State v. Lemasters*, 456 S.W.3d 416, 426 (Mo. 2015) (citations and internal quotation marks omitted).

Because the circuit court's judgment inaccurately reports the nature of the offense of which Gonsalez was convicted on Count I, we vacate the judgment and remand to the circuit court for entry of a *nunc pro tunc* judgment which correctly and consistently names the offense, and identifies it as a class B felony.

Point III is granted.

15

## Conclusion

We affirm Gonsalez's conviction for first-degree child endangerment. We vacate the judgment and remand to the circuit court with directions that it enter a judgment *nunc pro tunc* accurately memorializing Gonsalez's conviction for voluntary manslaughter as a class B felony.

_____
Alok Ahuja, Judge

All concur.

16