**STATE of Missouri, Respondent,**

v.

**Danial Morgan RINEHART, Appellant.**

**No. WD 72587.**

Missouri Court of Appeals, Western District.

Nov. 13, 2012.

---

Samuel Buffaloe, Assistant Public Defender, Columbia, MO, for Appellant.

Chris Koster, Attorney General, Karen L. Kramer, Assistant Attorney General, Jefferson City, MO, for Respondent.

Before Division Two: LISA WHITE HARDWICK, Presiding Judge, and JAMES M. SMART, JR., and KAREN KING MITCHELL, Judges.

KAREN KING MITCHELL, Judge.

Appellant, Danial Rinehart, was convicted by a jury of murder in the second degree pursuant to § 565.021 (felony murder),[1] child endangerment in the first degree pursuant to § 568.045,[2] statutory rape in the second degree pursuant to § 566.034, two counts of incest pursuant to § 568.020, and two counts of abandonment of a corpse pursuant to § 194.425. Rinehart's motions for judgment of acquittal were denied by the trial court. Rinehart filed a timely appeal. On appeal, Rinehart argues that the trial court erred in denying his motions for judgment of acquittal on the crimes of felony murder and child endangerment because the evidence was insufficient to support the element that he "knew" he was creating a substantial risk

---

1. Statutory citations are to RSMo 2000, unless otherwise noted.

2. The felony murder conviction was predicated upon child endangerment in the first degree.

to the life, body, or health of a child. Finding no error of law, we affirm.

## Factual Background[3]

Danial Rinehart ("Rinehart") and his wife Linda had four daughters: T.R., A.R., H.R., and D.R. Rinehart began having an incestuous relationship with A.R. when she was five years old. He fathered four children with A.R. Three of the four children, Ethel, Jack, and Goldie, died at birth or in infancy. A.R. did not receive any medical care during or after any of her four pregnancies. All of A.R.'s children were delivered at home, and Rinehart, who had no medical training, assisted with each delivery. None of the children who died were ever seen by a doctor or taken to a hospital.

A.R. and Rinehart's first child, Ethel, was born on March 4, 2004, when A.R. was fourteen years old. Ethel was delivered in an overhead camper—the kind that attaches to the back of a pickup truck—on property in Dustin, Oklahoma, where the family was staying. Rinehart and A.R.'s older sister, T.R., were the only people present when Ethel was delivered. After Ethel was born, A.R. and the rest of the family moved to Montrose, Missouri. While staying in Montrose, Ethel rolled off a couch onto the floor in the overhead camper. Despite the fact that Rinehart knew about Ethel's fall and her crying, Ethel was not taken anywhere for medical treatment. On July 8, 2004, the morning after the fall, A.R. woke to find that Ethel had died. Rinehart took Ethel's body to Ivy Bend, Missouri, and buried her on a friend's property. Ethel's body was later moved to Oklahoma.

The family continued to live in Montrose until May 2005 when Rinehart, his wife, and their four daughters, moved to Rine-

hart's mother's property on Taylor Road in Harrisonville, Missouri. A.R. and Rinehart had a second child, I.R., who was born on August 2, 2005, when A.R. was sixteen years old. I.R. was delivered in a pickup truck at the property on Taylor Road. Other than Rinehart, no one was with A.R. during the delivery. At the time of trial, I.R. was four years old.

A.R. and Rinehart had a third child, Jack, who was born on November 17, 2006, when A.R. was seventeen years old. A.R. gave birth to Jack in the overhead camper at the property on Taylor Road. Again, no one but Rinehart was with A.R. during the delivery. A.R. testified that Rinehart's help during Jack's delivery consisted of pumping on A.R.'s stomach to get the placenta to come out and cutting the umbilical cord with scissors and tying it off with a thread. Jack's delivery was longer than the previous two deliveries, and he was smaller at birth than both Ethel and I.R. A.R. noticed that, when Jack was born, he was wheezing. In December 2006, Jack became very ill. A.R. observed that he was pale, he could barely move his arms, he was congested in his chest and lungs, he had a fever, he was throwing up his milk, and there was mucus in his vomit.

Over-the-counter medicine was used to treat Jack's illness in December and he initially appeared to improve, but, over time, Jack's condition deteriorated. By February 6, 2007, Jack's symptoms had become noticeably worse. Yet, Jack was only given over-the-counter medicine to treat his illness. The night before Jack died, he was obviously having a lot of difficulty breathing. A.R. talked to Rinehart about Jack's worsening symptoms, but Rinehart still refused to take Jack to a doctor or to a hospital. A.R. stayed up

---

3. On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict. *State v. Smith*, 185 S.W.3d 747, 751 (Mo.App. S.D.2006).

with Jack for two nights in a row, and, when she dozed off the second night, she woke to find that he had died in her arms. Jack's body was left in the overhead camper for two weeks before it was placed into a plastic container. Later, the boy's body was placed in a cooler and buried in a garage on the property.

Rinehart lived at the property with A.R. from the time Jack was born until Jack's death in February 2007, and Rinehart was aware of Jack's condition. The property on Taylor Road was located in close proximity to several hospitals and clinics, and there was a phone at the property that Rinehart could have used to call for medical assistance. A.R. testified that she talked with Rinehart about taking Jack to see a doctor, and Rinehart "said he didn't want him to go to the hospital to see his son with hoses hanging out of him." In a police interview, Rinehart provided several reasons why he never took Jack to see a doctor, all of which differed from the reason he gave A.R. For example, Rinehart said that he did not take Jack to the doctor because his father (A.R.'s grandfather) had died of a heart attack while waiting for an ambulance to arrive, there was no insurance to cover the cost, he perceived his own previous medical treatment of his foot to have been done very poorly, and he did not think Jack's condition was that bad.

Dr. Ariel Goldschmidt, the doctor who examined Jack's remains on January 2, 2009, testified that Jack's symptoms (chest congestion, throwing up milk, difficulties moving his arms, pale complexion, and a fever) were consistent with respiratory illness, though they could be caused by other life-threatening illnesses as well. Dr. Goldschmidt testified that the respiratory illness "could be infection of the lungs, virus or bacteria, which could eventually lead to infection of the bloodstream and an eventual overwhelming of the body's defenses." He testified that these types of illnesses can be treated by medical professionals and that treatment may include antibiotics, hydration, and assisted respiration. When asked whether this type of illness could be cured with over-the-counter medicine once it became life threatening, Dr. Goldschmidt indicated, "probably not." He further testified that a child who does not receive immunization shots "would be more susceptible to those kind[s] of infections." Dr. Goldschmidt testified that, due to the state of Jack's remains, he could not determine the exact cause or manner of Jack's death.

A.R.'s fourth child with Rinehart, Goldie, was born on April 6, 2008, when A.R. was eighteen years old. Goldie was also delivered in the overhead camper on the Taylor Road property. Rinehart and I.R. were the only people in the camper with A.R. when Goldie was born. It was a long, hard, and painful delivery. Goldie was stillborn. Rinehart did not call an ambulance, a doctor, or the police, and he did not take Goldie to the hospital. Rather, he put Goldie's body inside a cooler and sealed it shut.

In October 2008, an investigation was opened after the Cass County Sheriff's Office received a report that Rinehart was having an inappropriate sexual relationship with his daughter and that there might be human remains on the Taylor Road property. On January 1, 2009, the two coolers containing the remains of Jack and Goldie were discovered on the property. Rinehart was tried and convicted by a jury of second-degree (felony) murder, first-degree child endangerment, second-degree statutory rape, two counts of incest, and two counts of abandonment of a corpse.[4]

---

4. The felony murder and child endangerment counts were based on the circumstances lead-

ing to Jack's death.

He was sentenced to a total term of life imprisonment plus twenty-two years. This appeal followed.

## Standard of Review

In his single point on appeal, Rinehart argues that there was insufficient evidence to support his conviction of child endangerment in the first degree. Child endangerment in the first degree was the predicate offense for the felony murder charge; thus, if there was insufficient evidence to support the child endangerment in the first degree conviction, the felony murder conviction would also have to be vacated. When reviewing a challenge to the sufficiency of the evidence, we are "limited to determining whether there is sufficient evidence from which a reasonable juror might have found the defendant guilty beyond a reasonable doubt." *State v. Crawford*, 68 S.W.3d 406, 408 (Mo. banc 2002). We view the evidence "in the light most favorable to the verdict, making all reasonable inferences therefrom, and disregard[ing] all evidence and inferences contrary to that finding." *State v. Uptegrove*, 330 S.W.3d 586, 590 (Mo.App. W.D.2011).

▇▇▇ When the record contains facts supporting conflicting inferences, we presume "that the trier of fact resolved any such conflicts in favor of the prosecution, and [we] must defer to that resolution." *Jackson v. Virginia*, 443 U.S. 307, 326, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). "The fact-finder may believe all, some, or none of the testimony of a witness when considered with the facts, circumstances and other testimony in the case." *Crawford*, 68 S.W.3d at 408. "We defer to the superior position of the jury to assess the credibility of witnesses and the weight and value of their testimony." *State v. Davis*, 219 S.W.3d 863, 866 (Mo.App. S.D.2007).

## Analysis

Rinehart challenges his first-degree child endangerment conviction, arguing that there was insufficient evidence for a reasonable juror to have found beyond a reasonable doubt that Rinehart *knew* he was creating a substantial risk to Jack's life, body, or health by failing to obtain medical care for him. We disagree.

Under § 568.045.1(1), "[a] person commits the crime of endangering the welfare of a child in the first degree if ... [t]he person knowingly acts in a manner that creates a substantial risk to the life, body, or health of a child less than seventeen years old." [5] Section 562.016.3(2) states that "[a] person 'acts knowingly' or with knowledge, ... [w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." Count II of the Information charged that Rinehart "knowingly acted in a manner that created a substantial risk to the life and body and health of [Jack] ... by failing to obtain medical care." Rinehart argues that the evidence is insufficient to prove that he *knew* that by failing to obtain medical care for Jack, he was

5. Under § 565.021.1(2), a person commits felony murder if he "[c]ommits or attempts to commit any felony, and, in the perpetration or the attempted perpetration of such felony or in the flight from the perpetration of such felony, another person is killed as a result of the perpetration or attempted perpetration of such felony or immediate flight from the perpetration of such felony or attempted perpetration of such felony." Rinehart's argument on appeal regarding the felony murder conviction is that it must be reversed if we find that there was insufficient evidence to support his conviction of child endangerment in the first degree. Because we find that there was sufficient evidence to support the child endangerment in the first degree conviction, the felony murder conviction is also affirmed.

creating a substantial risk to Jack's life, body, or health.[6]

A parent's failure to provide or obtain adequate medical care for a child can be the basis for a child endangerment conviction. *See State v. Dailey*, 755 S.W.2d 348, 350–51 (Mo.App. E.D.1988) (affirming a judgment of child endangerment against a mother who "knowingly failed to obtain adequate medical attention by failing to secure skull x-rays [after her six-week-old child was dropped face-down on a concrete driveway] . . ., thereby creating a substantial risk to [the child's] health"); *see also State v. Mahurin*, 799 S.W.2d 840, 844 (Mo. banc 1990) (affirming judgments of child endangerment and involuntary manslaughter where one child died from malnutrition and the other child was suffering

from starvation; and noting that, in addition to other evidence supporting the convictions, the parents should have recognized the grave condition of their children based upon their appearances).

### I. Rinehart's failure to act and the resulting substantial risk of harm

■ "'Substantial' is defined as 'not seeming or imaginary: not illusive' . . . [a]nd 'risk' is defined as 'the possibility of loss, injury, disadvantage or destruction.'" *State v. Brock*, 113 S.W.3d 227, 232–33 (Mo.App. E.D.2003) (internal citations omitted).[7] A conviction for child endangerment may be based upon a failure to act, if that failure poses "an actual or 'practically certain' risk or danger and not just the potential for risk or danger." *Carmons v. State*, 26 S.W.3d 382, 385 (Mo.

---

6. We will affirm the conviction of child endangerment in this case if we conclude that the evidence supports a finding that Rinehart was aware that his failure to obtain medical care for Jack, from the time he was born until the time he died, was practically certain to cause a substantial risk to Jack's life, body, or health. *See* § 562.016.3(2). Rinehart bases his appeal on the argument that he was not aware—he did not know—that his failure to obtain medical care could put Jack at such risk.

Rinehart's point relied on and the argument portion of his brief claim that there was insufficient evidence to support a finding of the knowledge element of the child endangerment statute. Rinehart does not argue in his brief that there was insufficient evidence from which the jury could find that there was a substantial risk to Jack's life, body, or health. In fact, he tacitly acknowledges that Jack's condition presented a significant risk to the infant's health when he states in his brief that his "assumptions and beliefs concerning [the seriousness of Jack's symptoms] were apparently incorrect."

Yet, at oral argument, Rinehart argued for the first time that there was no evidence that Jack's illness created a "substantial risk" to his life, body, or health because there was no definitive evidence that Jack died of a respiratory illness. Not only was this issue not

raised in Rinehart's briefing to this court, but Rinehart also failed to challenge the jury's findings regarding felony murder, other than to claim that the predicate offense of endangerment of a child was not supported by the evidence. In order to find Rinehart guilty of felony murder, the jury had to find that the evidence supported each of the elements of felony murder as laid out in the verdict director, including "that Jack Rinehart was killed by an illness." Because Rinehart failed to challenge this finding by the jury and because he did not otherwise challenge the sufficiency of the evidence to support the jury's finding that his failure to obtain medical care created a substantial risk to Jack's life, body, or health, that issue will not be addressed. The element of substantial risk is discussed in this opinion only as it is necessary to a complete understanding of the charge and conviction in this case.

7. The Missouri Supreme Court has found that the term "substantial risk" has "a plain and ordinary meaning cognizable by a person of ordinary intelligence," and, therefore, the terms are not vague, the words are of common usage, the terms are definite and certain, and this section of the statute is constitutional. *Mahurin*, 799 S.W.2d at 842. "Because a defendant's knowledge of the consequences of his or her actions must be proven, the possibility of arbitrary convictions is negated." *Id.*

App. W.D.2000) (quoting *State v. Wilson*, 920 S.W.2d 177, 180 (Mo.App. W.D.1996)). In *Wilson*, the court found that when a child is in actual need of medical attention and a parent fails to obtain the treatment required to prevent harm, "then the parent exposed the child to an actual danger, and thus the parent created a substantial risk to the life, body, or health of the child." 920 S.W.2d at 180 (a parent can be held criminally liable even in a situation where no harm results from the failure to provide medical treatment). Whether an actual risk to the child's life, body, or health exists "is a fact specific determination and requires an analysis of the facts in each case." *State v. Burrell*, 160 S.W.3d 798, 802 (Mo. banc 2005).[8]

■ It is important to note that, although harm does not have to result to constitute child endangerment, in order for a parent to be criminally liable for failure to act, the risk of harm must exist. *See Wilson*, 920 S.W.2d at 180 ("[T]he child must have an illness or injury which needs treatment to avoid harm to life, body[,] or health; only then can a failure to provide such treatment constitute an actual risk of danger."). The nature and seriousness of the illness or injuries suffered by a child can lead a fact-finder to make the "reasonable inference that substantial risk to the child's health resulted from [the] failure to obtain medical treatment." *Id.* at 179; *see also Dailey*, 755 S.W.2d at 350–51 (finding that there was sufficient evidence of child endangerment when a mother failed to get x-rays of her six-week-old child's skull after the baby was dropped on a concrete driveway). Moreover, a parent is "obligat-

ed to see to his children's health and welfare." *Mahurin*, 799 S.W.2d at 844.

■ The seriousness of Jack's condition was supported by A.R.'s testimony regarding his symptoms, her testimony that she stayed up with him for two nights before he died, and the testimony of Dr. Goldschmidt about the seriousness of certain respiratory illnesses and the consequences of not seeking medical treatment. In addition, there was evidence that Jack was having respiratory issues when he was born, that his delivery was difficult, and that he was smaller than A.R.'s other children had been at birth. He was sickly off and on throughout his short life, at times exhibiting potentially dangerous symptoms, such as wheezing, chest congestion, fever, vomiting, and difficulty moving his arms; and his health was noticeably worse in the days before his death. A.R. told Rinehart about Jack's symptoms and talked with him about taking Jack to the doctor, but Rinehart simply refused to do so.

A jury could have reasonably inferred, from the evidence of Jack's symptoms and his ultimate death, that Jack's health and life were at actual risk and that Rinehart's actions in failing to provide medical care for the entire period of Jack's life, including the days before his death, created a substantial risk to Jack's life, body, or health.

**II.  Rinehart's knowledge of the risk is evidenced by the totality of the circumstances**

8.  In his brief on appeal, Rinehart argues that upholding his conviction based on the facts of this case would set a dangerous precedent in that "anytime a parent buys one of these over-the-counter medications and administers it to their sick child instead of taking the child to seek medical attention, they run the risk of being guilty of child endangerment if the child is sicker than they believed." We disagree. Because we apply a totality of the circumstances standard, such an individual fact will always be considered in combination with other circumstances.

Rinehart argues that he was not *aware* of the risk created by his failure to act; in other words, he argues that the risk to his son was not *knowingly* created. As noted above, § 562.016.3(2) states that "[a] person 'acts knowingly' or with knowledge, . . . [w]ith respect to a result of his conduct when he is aware that his conduct is practically certain to cause that result." The result, as it applies to a conviction of child endangerment, is the substantial risk to the child's health, life, or body, created by the defendant's actions. Thus, the issue is whether Rinehart was *aware* that by failing to provide medical care, substantial risk to Jack's life, body, or health was practically certain to occur.

■■■■ " 'There is no bright line test to determine whether or not a person's actions knowingly create a substantial risk to the health of a child.' " *Burrell,* 160 S.W.3d at 802 (quoting *State v. Hunter,* 939 S.W.2d 542, 545 (Mo.App. E.D.1997)). Instead, the determination as to whether a defendant acted knowingly is based on the totality of the circumstances. *Id.; State v. Manwarren,* 139 S.W.3d 267, 272 (Mo.App. S.D.2004). "The State may prove a defendant's knowledge by direct evidence and reasonable inferences drawn from the circumstances surrounding the incident." *Burrell,* 160 S.W.3d at 802; *see also State v. Riggs,* 2 S.W.3d 867, 873 (Mo.App. W.D. 1999).

■■■ Direct evidence of one's mental state "is seldom available, and such intent is usually inferred from circumstantial evidence." *Martin,* 882 S.W.2d at 770; *see, e.g., State v. Gaver,* 944 S.W.2d 273, 277–79 (Mo.App. S.D.1997) (finding that the defendant knowingly failed to protect her children from their abusive father where the evidence showed that previous injuries to the children were observable and that the defendant had been informed by a doctor of the possible abuse before the incident in

question). In addition to the circumstantial evidence and reasonable inferences drawn from the surrounding facts, "[a] defendant's mental state may be reasonably inferred from the act itself." *State v. Theus,* 967 S.W.2d 234, 239 (Mo.App. W.D. 1998).

■■■ "Even in a circumstantial evidence case, the evidence need not be conclusive of guilt, nor must the evidence exclude every hypothesis of innocence." *Martin,* 882 S.W.2d at 770. A defendant's prior similar act, along with the totality of the circumstances surrounding the incident at issue, "could lead a jury to determine that [the defendant] acted knowingly in repeating the same action at a later time." *Manwarren,* 139 S.W.3d at 272 (relying on defendant's prior act of throwing the victim in the air and causing the victim's head to go through the ceiling in determining that the defendant knowingly created a substantial risk to the child victim). In addition to prior similar acts, a fact-finder may also make inferences regarding a defendant's level of awareness based upon the child's appearance. *State v. Buhr,* 169 S.W.3d 170, 177 (Mo.App. W.D.2005) ("The visible appearance of a child can give notice to the parents that their child is being abused or needs medical attention.").

■■■ Rinehart was present when Jack was born, and he was living on the property with A.R. and Jack for Jack's entire life. From the time of his birth, there was evidence that Jack had health problems. He was delivered in the camper on the property where the family lived, without the benefit of any medical assistance; instead, the only assistance provided was from Rinehart, who had no medical training. A.R. testified that Jack's delivery was very long and difficult. Jack was smaller than A.R.'s other children at birth, and he was wheezing when he was born.

Jack was sick on and off throughout his three-month life. Rinehart was aware of

Jack's health conditions and had conversations with A.R. about Jack's condition. Jack's symptoms in December included lack of color, fever, limited ability to move his arms, chest and lung congestion, and throwing up milk with mucus in it. Although Jack's condition appeared to improve after he was treated with over-the-counter medicine in December, by February, his symptoms were worse. He had noticeable breathing difficulties. A.R. told Rinehart that they should take Jack to the hospital. Rinehart responded by telling A.R. that "he didn't want him to go to the hospital to see his son with hoses hanging out of him." The only treatment Jack ever received was over-the-counter medicine. A.R. stayed up with Jack for two nights in a row. His health appeared to be at its worst in the early morning of February 6, 2007. Rinehart still refused to take Jack to the hospital or call a doctor. Jack died in A.R.'s arms without having ever received any professional medical care. Based on the evidence of Jack's symptoms, the jury could have reasonably concluded that Rinehart knew that failing to obtain medical assistance for Jack presented a substantial risk to the infant's life, body, or health. Further, from Rinehart's response to A.R.'s request that they seek medical attention (that he did not want to see his son in a hospital with hoses hanging out of him), the jury could have inferred that Rinehart was aware that his son's illness was serious enough that it could require medical intervention and treatment.

Infants are particularly vulnerable. Rinehart had experience with the dire consequences of not obtaining medical care for an infant. A.R. and Rinehart's first child, Ethel, died after rolling off of a couch onto the floor. Ethel was not taken to a hospital or to see a doctor after her fall. The next morning she was found dead. Rinehart knew that Ethel had fallen off the couch onto the floor and that, without the benefit of medical care, she died. The jury could have reasonably inferred, based on Rinehart's experience with Ethel, that he knew the risk of not obtaining medical care for a sick or injured infant.

From the evidence of the family's living conditions, the incestuous nature of Rinehart's relationship with his daughter, his failure to obtain pre- or post-natal care for A.R., and his failure to obtain any medical care for any of A.R.'s children, the jury could have reasonably concluded that it was Rinehart's desire to conceal the nature of his relationship with A.R., rather than his belief that Jack did not need medical care, that motivated him not to seek medical assistance for Jack.

A reasonable juror could have found, based on the totality of the circumstances, that Rinehart was aware of Jack's health condition and that he knew that failing to obtain professional medical care was practically certain to create a substantial risk to Jack's life, body, or health. Therefore, the evidence was sufficient to support his conviction of first-degree child endangerment.

### Conclusion

After reviewing the evidence in the light most favorable to the jury's verdict, granting all reasonable inferences to the State, and looking at the totality of the circumstances, we conclude that the evidence was sufficient to support the jury's finding that Rinehart knowingly created a substantial risk to Jack's life, body, or health by failing to obtain medical care. The judgment is affirmed.

LISA WHITE HARDWICK, Presiding Judge, and JAMES M. SMART, JR., Judge, concur.