

# In the
# Missouri Court of Appeals
## Western District

| | | |
|---|---|---|
| **STATE OF MISSOURI,** | ) | |
| | ) | |
| **Respondent,** | ) | **WD86509** |
| | ) | |
| **V.** | ) | **OPINION FILED:** |
| | ) | **APRIL 8, 2025** |
| **JENNA M. BOEDECKER,** | ) | |
| | ) | |
| **Appellant.** | ) | |

**Appeal from the Circuit Court of Clay County, Missouri**
The Honorable Shane Terril Alexander, Judge

Before Division Four:  Anthony Rex Gabbert, Chief Judge, Presiding, Cynthia L. Martin, Judge and Edward R. Ardini, Jr., Judge

Following the death of her children by hyperthermia, Jenna M. Boedecker ("Boedecker") was convicted of four counts of the class D felony of endangering the welfare of a child in the first degree; two counts of the class A felony of murder in the second degree (felony murder) associated with two of the endangering the welfare of a child counts; one count of the class A misdemeanor of domestic assault in the fourth degree; and one count of the class B misdemeanor of property damage in the second degree.  On appeal, Boedecker contends that her convictions for endangering the welfare

of a child in the first degree, and as a result, her associated convictions for felony murder were not supported by sufficient evidence.  Boedecker also argues that all of her convictions should be reversed because irrelevant evidence of her methamphetamine use was erroneously admitted.  Finding no error, we affirm.

## Factual and Procedural Background

Boedecker's convictions were the result of events that occurred from July 3, 2018, into the morning of July 4, 2018.  The events culminated in the tragic death of two-year old I.R.,[1] and seven-week old G.R., Boedecker's children.  Viewed in the light most favorable to the verdict, the following evidence was adduced at trial.[2]

Boedecker and her children were picked up by a friend, S.B., on July 3, 2018 at around 11:00 a.m. to go to a neighborhood pool in Kearney, Missouri.  S.B. observed that Boedecker "just didn't seem right . . . like, she wasn't completely there."  When the group arrived at the pool, Boedecker immediately walked away from S.B.'s car to use a landline telephone at the pool.  Boedecker left G.R. in the car in her car seat.  S.B. became concerned about the heat and took G.R. out of the car when she realized Boedecker had not done so.  S.B. stated that Boedecker was more concerned with whoever was on the phone than she was with her children.

---

[1]All witnesses, victims, and others who are not parties are referred to by their initials or by other non-identifying references in accordance with the redaction requirements of section 509.520.

[2]"On appeal from a jury-tried case, we view the facts in the light most favorable to the jury's verdict." *State v. Moore*, 687 S.W.3d 1, 4 n.2 (Mo. App. W.D. 2024) (quoting *State v. Morgan*, 674 S.W.3d 497, 500 n.1 (Mo. App. W.D. 2023)).

After a short period of time, the group was asked to leave the pool because Boedecker's swimsuit top was ill-fitting. Boedecker started to put G.R. into her car seat but was stopped by S.B. who said the children should not be placed in the car before it had been started because of the heat. S.B. dropped Boedecker and the children at Boedecker's home around 12:30 p.m.

At approximately 1:00 p.m., a neighbor, C.M., saw Boedecker in another neighbor's backyard talking to a blue ball while "beating on the back door, on the side of the house, the windows . . . [and] try[ing] to get into the cars in the driveway." After watching Boedecker for about ten minutes, C.M. called the police because she did not believe anyone was home at the house Boedecker was trying to enter. However, while she was on the phone with the police, C.M. saw someone open the front door of the house to let Boedecker inside. As a result, C.M. told the operator there was no need for the police to respond.

About twenty minutes later, C.M. saw Boedecker walk out the front door of the neighbor's house. Boedecker reached into the rear passenger side door of a car in the driveway, removed I.R. and G.R. from the back seat of the car, and took the children into the neighbor's house. C.M. was concerned because her thermometer situated in the shade read ninety-three degrees, and Boedecker's car had been off with the windows rolled up the entire time she had been watching Boedecker. C.M. immediately called the police a second time to report her concern that two children had been left in a hot car for an extended period of time. When the police arrived, Boedecker took the children from the neighbor's house back to her vehicle. The police cautioned Boedecker about leaving

3

children in a hot car. Boedecker placed G.R. in her car seat and then got into the driver's seat. An officer had to tell Boedecker that I.R. was still standing outside in front of the car. Boedecker got back out of her car, placed I.R. in the backseat, and drove away.

At around 4:00 p.m. that afternoon, J.R., who was Boedecker's husband and the father of I.R. and G.R., returned home from work. J.R. agreed to watch the children while Boedecker drove to pick up a pack of cigarettes. After Boedecker had been gone for about an hour and a half, J.R. tried to call her but the calls went straight to voicemail. J.R. called his mother, T.B., who offered to come watch the children while J.R. went searching for Boedecker. On the way to J.R.'s home, T.B. saw Boedecker's vehicle broken down in the middle of 92 highway.

The police were called to the scene just before 8:00 p.m. Boedecker told the responding officers that her car was inoperable and that a friend was on the way to help move her car from the middle of the road. Boedecker was behaving strangely. She made flirtatious comments to the officers, was constantly moving back and forth on the highway, and was standing in physically awkward positions. Eventually, J.R. arrived. He determined that Boedecker's vehicle was out of gas. J.R. added four gallons of gas to the car, and then drove the vehicle home.

Back at the house, Boedecker's strange behavior continued. She was observed outside in the dark wearing only her underwear while picking flowers. I.R. was with Boedecker and was completely naked. At some point that evening, J.R. left in his truck to get more gasoline for Boedecker's car. When J.R. returned about thirty minutes later, he discovered that Boedecker had placed the children in her car and "was just listening to

4

music." J.R. removed the children from the car, put G.R. in her bassinet to sleep, and watched a movie with I.R. for about thirty minutes. J.R. observed that Boedecker was not acting like herself and seemed "loopy." J.R. asked Boedecker for her bottle of Xanax. Though Boedecker had filled the prescription with 120 pills that same day, J.R. counted only ninety-eight pills in the bottle at around 10:30 p.m.

After giving J.R. the pill bottle, Boedecker went back outside and started her car. G.R. and I.R. were asleep inside the house. When J.R. had returned from the gas station earlier in the evening, he added an additional two-and-a-half gallons of gasoline to the car so that the car now had about eight gallons of gas in the tank. After Boedecker started her car, J.R. reached into the vehicle, turned it off, and told Boedecker that he needed to do some repair work on the car. J.R. set the car keys on Boedecker's lap. J.R. turned to walk to his truck. Boedecker turned her car back on, accelerated, and propelled towards J.R. and his truck. J.R. narrowly escaped being hit, but Boedecker hit J.R.'s truck before speeding into a nearby field and looping back around in front of the house. J.R. started taking pictures of the damage to his truck. Boedecker got out of her car, picked up a brick, and threw it at J.R.'s head. J.R. dodged the brick, but Boedecker picked up another brick and chased J.R. around the yard. J.R. made it into his truck before Boedecker threw the brick which skipped across the truck's window. J.R. began driving down the driveway to escape. Boedecker picked up a brick and chased J.R.'s truck. J.R. kept driving and left the home at around 12:30 a.m. on July 4, 2018. J.R. decided to stay at his mother's house for the night.

At around 9:40 a.m. on July 4, 2018, a Clay County Children's Division employee arrived at Boedecker's home to follow-up on the hotline call made by C.M. the previous day after Boedecker's children had been left in her hot car for an extended period of time. The Children's Division employee noticed that a car was running in the driveway but did not look inside the vehicle. At the front door of the house, the Children's Division employee observed that the screen door was shut but the front interior door was wide open permitting the worker to see into the living room. A cat was walking around inside and the TV was on, but the Children's Division employee did not see anyone inside the house. After knocking loudly three times and receiving no response, the Children's Division employee left Boedecker's home fifteen minutes after arriving.

At 11:55 a.m. that same day, a neighbor watched Boedecker come towards his house holding her two children. Boedecker carried I.R. in her left arm and was holding G.R., dangling by her wrist, in her right hand. Boedecker told the neighbor she had put the children in the car because her home's air-conditioning was not working. Boedecker said that the car ran out of gas at some point during the night. The neighbor observed that the children were unconscious and were "a blue color." The neighbor and his family called 911, attempted to cool the children down, and performed life-saving measures in an effort to revive I.R. and G.R. EMT's arrived and also attempted life-saving measures but ultimately determined that the children were deceased. Lividity had already set in and G.R. had a soiled diaper.

When police arrived, they discovered Boedecker's car in the driveway with a red gas can near the rear tire. The car was not running. The key was in the ignition in the

6

"on" position.  However, Boedecker's car would not start.  In the car, police discovered two boxes of cigarettes, ninety-two Xanax pills, and an empty pill bottle labeled for a prescription of "amphetamine salts."  Police observed that the interior front door to Boedecker's home was open, that several kittens were in the house, and that the air conditioning unit was on and functioning.

Boedecker was questioned by the police at the scene.  Boedecker told officers that she had taken the children out of the house and put them in the car to sleep but that at some point during the night the car ran out of gas.  She told police that she woke up at one point and noticed the car was low on gas but couldn't figure out how to refill it so she got back into the car and went back to sleep.  Boedecker told officers that when she woke up again she noticed that her children were unresponsive, attempted CPR, and then took the children to the neighbor's house for help.

Boedecker was taken to the police station for further questioning.  Boedecker changed her story.  She now told police that she had been waiting outside for her husband to return with gas for the car, that she did not have keys to her house, and that because she believed J.R. would be returning shortly, she turned the air-conditioner on in the car and "dozed off" before waking up and realizing that she was "hot as shit."  Boedecker told police that she then pulled the children out of the car, took them in the house, doused them with cold water, and attempted CPR before taking the children to her neighbor's house.  Boedecker repeatedly told police that she knew it was dangerous for children as young as I.R. and G.R. to be left in a hot car but said she thought the car was comfortable because it was dark outside.

7

In subsequent interviews by police, Boedecker continued to maintain that she woke up in the vehicle at some point to find her children unresponsive but now claimed that she could not remember if she slept in the car for the entire night or if she woke up at some point and slept inside the house. Boedecker told police she did remember taking two Xanax pills after J.R. left to go to his mother's house. In a later interview with police, Boedecker claimed that she remembered waking up at some point during the night and climbing into the backseat to nurse G.R. before returning to the driver's seat and falling asleep again.

Boedecker was arrested on August 8, 2018. She was charged with two counts of the class D felony of endangering the welfare of a child in the first degree, in violation of section 568.045,[3] for her alleged failure on the morning of July 4, 2018, to "adequately care for [G.R. and I.R.] after [they were] placed in an automobile that later reached a dangerous interior temperature" resulting in the children's deaths. Associated with these counts, Boedecker was also charged with two counts of the class A felony of murder in the second degree, (felony murder), in violation of section 565.021. Boedecker was charged with two additional counts of the class D felony of endangering the welfare of a child in the first degree, in violation of section 568.045, for her alleged failure on July 3, 2018, to "care for [I.R. and G.R.] after [they were] placed in an automobile during hot daylight weather." Finally, Boedecker was charged with one count of the class E felony

---

[3]All statutory references are to RSMo 2016 as supplemented through the date of Boedecker's offenses, unless otherwise indicated.

of domestic assault in the third degree in violation of section 565.074, and one count of the class E felony of property damage in the first degree in violation of section 569.100.[4]

At trial, in addition to the evidence described above, the jury heard testimony from the medical examiner who performed autopsies on I.R. and G.R. The medical examiner testified that the children died as a result of hyperthermia while sitting in their car seats in Boedecker's car. The medical examiner testified that temperatures in excess of 104 degrees Fahrenheit are dangerous for the human body to be exposed to "for any period of time." A police officer testified that simple thermometer testing of Boedecker's car in her driveway on July 5, 2018, during similar conditions to those on July 4, 2018, showed that when outside temperatures were between ninety-one degrees and ninety-five degrees, the interior vehicle temperature measured at between 110 and 111 degrees.

The toxicologist who evaluated a blood sample taken from Boedecker a little after 6:30 p.m. on July 4, 2018, testified that the amount of Xanax in her system at that time was two-and-a-half times higher than would be expected in a person who was taking Xanax in the manner prescribed. The toxicologist testified that the concentration of Xanax in Boedecker's blood would have caused her to be more susceptible to the negative side effects of the drug including sedation, drowsiness, poor memory, poor coordination, and a reduced sense of care. The toxicologist also testified that trace amounts of methamphetamine were discovered in Boedecker's blood sample, indicating that she was likely in a "withdrawal phase" and had used the substance at least two days

---

[4]Boedecker was also charged with the unclassified felony of armed criminal action in violation of section 571.015, but was later acquitted of that charge.

prior to testing. The toxicologist testified that while the amount of methamphetamine in Boedecker's system was on the low end for someone who uses the drug recreationally, when combined with the Xanax in Boedecker's system, the methamphetamine would have enhanced the effects of sedation and drowsiness.

Boedecker was convicted by a jury of the four charged counts of felony endangering the welfare of a child, and of the two associated counts of felony murder. On the domestic assault and property damage charges, Boedecker was convicted of the lesser included offenses of a class A misdemeanor of domestic assault in the fourth degree in violation of section 565.076, and a class B misdemeanor of property damage in the second degree in violation of section 569.120.

On August 3, 2023, the court held a sentencing hearing after which it entered its judgment of conviction and sentence ("Judgment"). The Judgment incorrectly identified Boedecker's conviction for domestic assault as domestic assault in the third-degree rather than domestic assault in the fourth-degree, the charge which she was convicted of by the jury. Similarly, the Judgment incorrectly identified Boedecker's conviction for property damages as property damage in the first-degree rather than property damage in the second-degree, in accordance with the jury's verdict. The trial court corrected its clerical mistakes in a *nunc pro tunc* judgment which it entered on August 14, 2023.

Boedecker was sentenced to consecutive sentences of twenty-two years imprisonment for each count of second-degree murder; consecutive sentences of seven years imprisonment for each of the two counts of first-degree endangering the welfare of a child that arose from the events on July 4, 2018; concurrent sentences of one year

10

imprisonment for each of the two counts of first-degree endangering the welfare of a child that arose from the events on July 3, 2018; and concurrent sentences of six months and three months respectively in the county jail for the misdemeanor domestic assault and property damage convictions. As a result, Boedecker was sentenced to a total term of imprisonment of fifty-eight years.

Boedecker filed this timely appeal on August 8, 2023.[5]

## Analysis

Boedecker raises three points on appeal. In Point One, Boedecker argues that there was insufficient evidence of the essential element of "knowledge" to support her convictions of two counts of endangering the welfare of a child based on events that occurred on July 4, 2018. As a result, Boedecker also argues that the associated convictions of two counts of felony murder are not supported by sufficient evidence. In Point Two, Boedecker contends that the trial court erred in admitting evidence of her methamphetamine use because the evidence was irrelevant. In Point Three, Boedecker argues that there was insufficient evidence of the essential element of "a substantial risk" to the life or health of a child to support her convictions of two counts of endangering the

---

[5]A nunc pro tunc correction of a judgment is not a new, appealable judgment, but is instead a clerical entry narrowly authorized by Rule 29.12(c) (in criminal cases) and Rule 74.06(a) (in civil cases) that relates back to the date of entry of the original judgment. *State v. Campbell*, 598 S.W.3d 151, 153-54 (Mo. App. S.D. 2020) (citing *McGuire v. Kenoma, LLC*, 447 S.W.3d 659, 663-64 (Mo. banc 2014); *State v. Nelson*, 505 S.W.3d 869, 872 (Mo. App. W.D. 2016)). Boedecker's appeal was correctly and timely taken from the original Judgment.

11

welfare of a child based on events that occurred on July 3, 2018. We address Boedecker's first and third points collectively before turning to her second point.

***The evidence was sufficient to support Boedecker's convictions of four counts of endangering the welfare of a child in the first degree. (Points One and Three)***

"When reviewing a claim challenging the sufficiency of the evidence, this Court must make a *de novo* determination whether the evidence is sufficient to permit a reasonable fact-finder to find the necessary facts beyond a reasonable doubt." *State v. Nowicki*, 682 S.W.3d 410, 414 (Mo. banc 2024) (citing *State v. Boyd*, 659 S.W.3d 914, 925 (Mo. banc 2023)). "In doing so, this Court will accept as true all evidence tending to prove those facts and will draw all reasonable inferences in favor of finding those facts." *Id.* (citing *State v. Collins*, 648 S.W.3d 711, 718 (Mo. banc 2022)). This analysis is not a test of "whether the Court believes that the evidence at trial established guilt beyond a reasonable doubt but rather a question of whether, in light of the evidence most favorable to the State, any rational fact-finder 'could have found the essential elements of the crime beyond a reasonable doubt.'" *State v. Devalkenaere*, 684 S.W.3d 1, 13 (Mo. App. W.D. 2023) (quoting *State v. Liberty*, 370 S.W.3d 537, 543-44 (Mo. banc 2012)).

Section 568.045.1 provides, in pertinent part, that "[a] person commits the offense of endangering the welfare of a child in the first degree if he or she: (1) *[k]nowingly* acts in a manner ***that creates a substantial risk to the life, body, or health of a child*** less than seventeen years of age." (Emphasis added). To support Boedecker's four convictions of endangering the welfare of a child in the first degree, the State was therefore required to establish beyond a reasonable doubt that: (1) Boedecker committed an act; (2)

12

Boedecker's act or conduct created a substantial risk to the life, body, or health of I.R. and G.R.; (3) I.R. and G.R. were less than seventeen years of age; and (4) Boedecker acted knowingly. MAI-CR 4th ed. 422.10.

In Point One, Boedecker challenges the two convictions of endangering the welfare of a child in the first degree related to events on July 4, 2018. She argues that there was insufficient evidence to establish beyond a reasonable doubt that she acted "knowingly" on July 4, 2018. Boedecker thus concedes the sufficiency of the evidence to establish the remaining essential elements of the two counts of endangering the welfare of a child in the first degree related to events on July 4, 2018, including that her acts or conduct on July 4, 2018, created a substantial risk to the life, body, or health of I.R. and G.R. In Point Three, Boedecker challenges the two convictions of endangering the welfare of a child in the first degree related to events on July 3, 2018. She argues that there was insufficient evidence to establish beyond a reasonable doubt that by leaving her children in her car on the afternoon of July 3, 2018, she created a "substantial risk to the life, body, or health" of I.R. or G.R. Boedecker thus concedes the sufficiency of the evidence to establish the remaining essential elements of the two counts of endangering the welfare of a child in the first degree related to events on July 3, 2018, including that she acted knowingly. We review Points One and Three in reverse order.

**A. Sufficient evidence permitted the jury to find beyond a reasonable doubt that Boedecker's actions on July 3, 2018 created a substantial risk to the life, body, or health of both I.R. and G.R. (Point Three)**

Boedecker asserts that there was insufficient evidence to prove beyond a reasonable doubt that she created a substantial risk to the life, body, or health of either

13

I.R. or G.R. when she left both children in her car on the afternoon of July 3, 2018. Boedecker claims that there was no evidence adduced at trial about the temperature or conditions inside her vehicle on July 3, 2018, or about the condition of the children after they had been left in the car. In contrast, Boedecker claims that the children were dressed appropriately for the hot weather, that she remained nearby while trying to get the attention of a friend, that the children were retrieved from the car before police arrived, and that the children were permitted to leave freely with Boedecker after the police arrived. Boedecker's argument is inconsistent with the law.

"In a child endangerment case, the State is not required to prove Defendant's actions caused Victim's death . . . [r]ather, the State is required to prove risk *i.e.*, the possibility of loss, injury, or disadvantage." *Scroggs v. State*, 655 S.W.3d 210, 217 (Mo. App. W.D. 2022) (internal quotations omitted). In the context of section 568.045, "'[s]ubstantial' means 'not seeming or imaginary: not illusive,' and 'risk' means 'the possibility of loss, injury, disadvantage or destruction.'" *State v. Shoemaker*, 675 S.W.3d 672, 678 (Mo. App. E.D. 2023) (quoting *State v. Rinehart*, 383 S.W.3d 95, 101 (Mo. App. W.D. 2012)). "Health, as used in section 568.045.1(1), includes a child's physical, mental, emotional, or psychological condition." *Id.* (quoting *Harding v. State*, 613 S.W.3d 522, 532 (Mo. App. E.D. 2020)). Missouri courts have clarified "that no injury or harm need result; a substantial risk may exist even though the risk does not materialize into actual harm." *State v. Todd*, 183 S.W.3d 273, 278 (Mo. App. W.D. 2005) (citation omitted). Whether a child was placed in substantial risk is a determination made by the fact-finder, or in this case, the jury. *See id.* at 276-77 (finding that the state must prove

14

the defendant's conduct giving rise to the risk but that it is the fact-finder's job to determine whether the conduct created a substantial risk to the child).

Here, the evidence at trial established that Boedecker left I.R. and G.R. in her car with the windows rolled up and the engine turned off for approximately thirty minutes on the afternoon of July 3, 2018. Although Boedecker was outside during the first ten minutes of this time frame, she was not next to the car and was instead wandering around her friend's yard banging on windows and doors and talking to a ball. For the next twenty minutes, Boedecker was inside her friend's house, leaving her children completely unattended. Thermometer testing evidence admitted at trial showed that on July 5, 2018, the interior of Boedecker's vehicle reached temperature of 110 to 111 degrees when the outside temperature was between ninety-one and ninety-five degrees. The evidence established that on July 3, 2018, while the children were unattended in Boedecker's car, the outside air temperature was ninety-three degrees in the shade permitting a reasonable inference that the interior temperature in the car was near 110 to 111 degrees. The medical examiner testified that exposure to temperatures in excess of 104 degrees for *any* period of time are dangerous to the human body permitting a reasonable inference that the life body, or health of the children was at substantial risk during the thirty-minute period of time they were inside Boedecker's car. Though no evidence was admitted to establish that the children suffered actual physical injury or harm after having been left in Boedecker's hot car for thirty minutes on July 3, 2018, evidence sufficient to establish a substantial risk of harm can exist even in the absence of a resulting injury or harm. *Todd*, 183 S.W.3d at 279 (finding that despite no actual injury or harm, the evidence was

15

sufficient to prove that the defendant created a substantial risk to the life, body or health of a child when defendant "left her nine-year-old son alone in a locked mini-van in a casino parking lot in the summer sun in 94-degree heat while she gambled").

In addition, Boedecker told police when she was interviewed that she knew it was dangerous to leave her children in a hot car. Though this admission was made following the children's death on July 4, 2018, the jury was permitted to consider the admission in weighing all of the evidence to conclude beyond a reasonable doubt that Boedecker created a substantial risk of harm to the life, body, and health of I.R. and G.R. when she left them unattended in a hot car for thirty minutes on July 3, 2018.

Sufficient evidence established beyond a reasonable doubt that Boedecker created a substantial risk to the life, body, or health of I.R. and G.R. when she left both children in her car on the afternoon of July 3, 2018. Point Three is denied.

### B. Sufficient evidence permitted the jury to find beyond a reasonable doubt that Boedecker acted knowingly on July 4, 2018 (Point One)

Boedecker does not contest that the evidence at trial was sufficient to prove beyond a reasonable doubt that she created a substantial risk to the life, body, or health of I.R. and G.R. when she left them in her vehicle during the morning hours of July 4, 2018. However, Boedecker challenges the sufficiency of the evidence to establish that she knowingly created this risk. Specifically, Boedecker contends that there was no evidence that the vehicle was hot when she first placed the children in the vehicle, nor was there evidence suggesting that she delayed taking prompt action upon becoming aware of the

16

dangerous circumstances. Once again, Boedecker's argument is inconsistent with the law.

"Knowingly" is defined in section 556.061(31).[6] When used with respect to conduct or attendant circumstances, knowingly "means a person is aware of the nature of his or her conduct or that those circumstances exist." Section 556.061(31)(a). When used with respect to a result of conduct, knowingly "means a person is aware that his or her conduct is practically certain to cause that result." Section 556.061(31)(b). In this case, the jury instructions included a definition of "knowingly" that used both statutory definitions.[7]

Because there is no "bright line test" to establish whether someone acted knowingly, courts look to the totality of the circumstances to make this determination. *See State v. Abel*, 590 S.W.3d 872, 875 (Mo. App. S.D. 2019) (quoting *State v. Burrell*, 160 S.W.3d 798, 802 (Mo. banc 2005)). "Direct proof that a person acted 'knowingly' is often unavailable and is usually inferred from evidence of the circumstances surrounding the incident." *State v. Browning*, 357 S.W.3d 229, 235 (Mo. App. S.D. 2012) (quoting

---

[6]Chapter 556 sets forth preliminary provisions of general application to Chapters 556 to 580, known and cited as "The Revised Criminal Code." Section 556.011. Section 568.045, describing the offense of endangering the welfare of a child in the first degree, is a part of The Revised Criminal Code.

[7]Boedecker has not challenged the jury instruction defining "knowingly" on appeal. We express no opinion as to whether the statutory definition of "knowingly" applicable to "conduct or attendant circumstances," or applicable to "a result of a person's conduct," should be applied to the charge of endangerment of the welfare of a child in the first degree in violation of section 568.045(1). However, we observe that the evidence in this case was sufficient to establish beyond a reasonable doubt that Boedecker acted knowingly pursuant to either subsection of the statutory definition.

17

*State v. Fackrell*, 277 S.W.3d 859, 863-64 (Mo. App. S.D. 2009)); *and see Abel*, 590 S.W.3d at 876 (finding that evidence was sufficient to establish the knowledge element when it showed that defendant, who had not seen any other adult get his infant out of the car and who knew that he was the only adult present responsible for the infant's care, failed to get the infant out of a car on a summer day).

Boedecker's neighbor testified that Boedecker came toward his house at 11:55 a.m. on July 4, 2018, carrying her children who were unconscious and blue. Boedecker told this neighbor that she had put the children in her car the night before because her home's air-conditioning was not working and that she believed the car ran out of gas at some point during the night. However, when police arrived on the scene, they observed that the air conditioning in Boedecker's house was working properly. The jury could reasonably infer from this evidence that Boedecker lied to the neighbor about why she had placed her children in the car to sleep because she knew she placed them at a substantial risk of harm by doing so. *State v. Buchli*, 152 S.W.3d 289, 297 (Mo. App. W.D. 2004) (holding that "[e]xculpatory statements, when proven false, evidence a consciousness of guilt") (quoting *State v. Clay*, 975 S.W.2d 121, 140 (Mo. banc 1998)).

When police questioned Boedecker at the scene, Boedecker claimed that she placed the children in the car to sleep, that she woke up at some point and realized that the car was low on gas, but that she went back to sleep inside the vehicle even though she couldn't figure out how to fill the car with more gas. The jury could readily conclude from this evidence that Boedecker knew she was leaving her children in a car that would not remain running much longer but fell back to sleep anyway. Coupled with

18

Boedecker's admission to the police that she knew it was dangerous for her young children to be left in a hot car, the jury could reasonably infer that Boedecker knew her conduct placed her children at substantial risk of harm.

Later, Boedecker changed her story to claim that she put the children in her car because she was waiting for J.R. to get home with gas for her car and could not get into the house as she had no keys. Boedecker claimed she "dozed off" while waiting for J.R., only to awake the next morning to discover that the car was "hot as shit" and that I.R. and G.R. were unresponsive. Other evidence established, however, that the children had been asleep in the house when J.R. left the house early on July 4, 2018, and that by at least 9:40 a.m. on July 4, 2018, when a Children's Division employee came to the house, and again when the police arrived, the front door of Boedecker's house was standing wide open, permitting the inference that the children did not need to be in the car in order to stay cool. Once again, the jury could reasonably infer from this evidence that Boedecker lied to the police about why she put her children in the car because she knew that she placed them at a substantial risk of harm by doing so. *Buchli*, 152 S.W.3d at 297 (holding that "[g]uilt may be inferred when an accused attempts to deceive the police, as in making a false exculpatory statement") (citation omitted).

During later interviews, Boedecker told police she could not remember if she slept in the car all night or if she woke up at some point to go sleep in the house. Boedecker also inconsistently told police that she remembered being in the car all night and waking at some point to nurse G.R. in the back seat before falling back asleep in the front seat. Boedecker's ever changing stories about her conduct from the time she placed her

19

children in the car late in the evening on July 3, 2018, until the time her unresponsive children were taken to a neighbor's house at 11:55 a.m. on July 4, 2018, permit the jury to infer that Boedecker knew that she had placed her children at a substantial risk of harm.

While Boedecker claims that there was no evidence adduced at trial that showed the vehicle was hot when she first placed the children in the car, this argument ignores that pursuant to at least two accounts Boedecker gave the police she placed her children in the car and/or left her children in the car and then fell asleep herself though she knew the car was low on gas. Sufficient evidence permitted the jury to conclude beyond a reasonable doubt that Boedecker knowingly created a substantial risk to the life, body, or health of I.R. and G.R. when she left them in her vehicle during the morning hours of July 4, 2018.

Bolstering this reasonable inference is the evidence that Boedecker had a pattern over a two-day period of disregarding the risk of leaving children in a hot car. At the pool on the morning of July 3, 2018, Boedecker left S.B.'s vehicle to go use a phone without taking G.R. out of her car seat. S.B. had to pull G.R. out of the car when she realized that Boedecker had left the child in a hot vehicle. Later that day, Boedecker left both I.R. and G.R. in her car for approximately thirty minutes with the engine off and the windows rolled up despite an outside temperature of at least ninety-three degrees. After police were called, they informed Boedecker that it was dangerous to leave children without active supervision in a car on a hot day. The officers also told Boedecker it was dangerous to leave children in a car even if the car is running with the air-conditioner on because the car could malfunction, putting the children in danger.

20

Sufficient evidence proved beyond a reasonable doubt that Boedecker acted knowingly when she created a substantial risk to the life, body, or health of I.R. and G.R. by leaving the children in her vehicle during the morning hours of July 4, 2018.

Point One is denied.

***The trial court did not commit reversible error in permitting the admission of evidence of Boedecker's methamphetamine use because there is no reasonable probability that the jury would have acquitted Boedecker but for admission of the evidence. (Point Two)***

In her second point on appeal, Boedecker claims that the trial court erred in admitting, over Boedecker's objection, evidence of Boedecker's methamphetamine use because the evidence was logically and legally irrelevant and violated Boedecker's right to be tried only for the offenses charged. In the argument portion of her brief, Boedecker argues that "[t]he evidence regarding methamphetamine served no purpose but to inform the jury she had committed an uncharged, prior bad act, and therefore that she was a bad person who was more likely to be guilty."

"We review the trial court's decision to admit or exclude evidence at trial for abuse of discretion." *State v. Moore*, 687 S.W.3d 1, 6 (Mo. App. W.D. 2024) (quoting *State v. Morgan*, 674 S.W.3d 497, 502 (Mo. App. W.D. 2023)). The trial court has broad discretion to admit or exclude evidence at trial and will only be found to have abused its discretion "when a ruling is clearly against the logic of the circumstances then before the court and is so arbitrary and unreasonable as to shock the sense of justice and indicate a lack of careful consideration." *State v. Mosely*, 701 S.W.3d 721, 723 (Mo. App. E.D. 2024) (quoting *Elliott v. State*, 215 S.W.3d 88, 92 (Mo. banc 2007)). "On direct appeal,

21

this Court reviews the trial court's rulings on admission of evidence for prejudice, not mere error, and will reverse only if the error was so prejudicial that it deprived the defendant of a fair trial." *Moore*, 687 S.W.3d at 6 (quoting *State v. Perkins*, 656 S.W.3d 285, 302 (Mo. App. E.D. 2022)). Trial court error resulting from the admission of evidence is prejudicial "if the error so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have reached a different conclusion without the error." *Id.* (quoting *Morgan*, 674 S.W.3d at 502).

Boedecker is correct that "[e]vidence of uncharged crimes is generally inadmissible to show a defendant's propensity to commit the charged offense." *State v. Stafford*, 589 S.W.3d 705, 711-12 (Mo. App. E.D. 2019) (quoting *State v. Schneider*, 483 S.W.3d 495, 505 (Mo. App. E.D. 2016). However, "'evidence of uncharged crimes that are part of the circumstances or the sequence of events surrounding the offense charged' may be 'admissible to present a complete and coherent picture of the events that transpired.'" *State v. Emery*, 701 S.W.3d 585, 604 (Mo. banc 2024) (quoting *State v. Morrow*, 968 S.W.2d 100, 107 (Mo. banc 1998)). "If evidence of uncharged crimes, wrongs, or acts tends to prove something other than the defendant's propensity to commit the crimes for which he is charged, then the question becomes whether the evidence is legally relevant." *Morgan*, 674 S.W.3d at 504-05 (quoting *State v. Jackson*, 636 S.W.3d 908, 921 (Mo. App. W.D. 2021)). "Evidence is legally relevant if its probative value outweighs its costs–unfair prejudice, confusion of the issues, misleading the jury, undue delay, waste of time, or cumulativeness." *Id.* (internal citation omitted).

22

Here, we need not address whether the evidence of Boedecker's methamphetamine use was logically relevant on an issue in dispute other than Boedecker's propensity to have committed the crimes charged. And we need not address whether the evidence of Boedecker's methamphetamine use, if logically relevant on an issue other than propensity, was nonetheless subject to exclusion because it was not legally relevant. Though Boedecker summarily argues in her brief that the evidence of her methamphetamine use "had no probative value and a very prejudicial effect," she fails to address whether trial court error in admitting the evidence (even if assumed, *arguendo*) requires reversal of her convictions.

"[I]t is well settled that 'a defendant seeking reversal has the burden of showing both error and resulting prejudice." *Stafford*, 589 S.W.3d at 712 (quoting *State v. Adams*, 350 S.W.3d 864, 866 (Mo. App. E.D. 2011)). "No prejudice results unless the erroneously admitted evidence so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that the jury would have acquitted but for the erroneously admitted evidence." *Id.* (internal quotation omitted); *and see Moore*, 687 S.W.3d at 6.

Boedecker does not argue that the erroneous admission of evidence of her methamphetamine use so influenced the jury that, when considered with and balanced against all of the evidence properly admitted, there is a reasonable probability that Boedecker would have been acquitted of all of the offenses with which she was charged. Boedecker's failure to address at all, let alone to sustain her burden to establish, that *reversible* error resulted from the purported erroneous admission of evidence of her

23

methamphetamine use is fatal to her appeal. *Moore*, 687 S.W.3d at 6; *Stafford*, 589 S.W.3d at 712.

In any event, our full and careful review of the record leaves this court persuaded that there is no reasonable probability that a jury would have acquitted Boedecker of all or any of her charged offenses but for the admission of the methamphetamine evidence. The evidence of Boedecker's guilt of the offenses charged was compelling and horrific, and is not unfairly embellished or magnified by the brief reference in the evidence to the low amount of methamphetamine found in Boedecker's system.

Boedecker has not sustained her burden to establish reversible error in the admission of evidence of her methamphetamine use. Point Three is denied.

## Conclusion

The trial court's Judgment is affirmed.

_____
Cynthia L. Martin, Presiding Judge

All concur

24